BOGAN ET AL. *v.* SCOTT-HARRIS

No. 96–1569.   Argued December 3, 1997—Decided March 3, 1998

THOMAS, J., delivered the opinion for a unanimous Court.

*Charles Rothfeld* argued the cause for petitioners. On the briefs were *Thomas E. Shirley, Bruce A. Assad,* and *Robert J. Marchand.*

*Harvey A. Schwartz* argued the cause for respondent. With him on the brief were *Siobhan M. Sweeney* and *Eric Schnapper.**

JUSTICE THOMAS delivered the opinion of the Court.

It is well established that federal, state, and regional legislators are entitled to absolute immunity from civil liability for their legislative activities. In this case, petitioners argue that they, as local officials performing legislative functions, are entitled to the same protection. They further argue that their acts of introducing, voting for, and signing an ordinance eliminating the government office held by respondent constituted legislative activities. We agree on both counts and therefore reverse the judgment below.

I

Respondent Janet Scott-Harris was administrator of the Department of Health and Human Services (DHHS) for the city of Fall River, Massachusetts, from 1987 to 1991. In 1990, respondent received a complaint that Dorothy Biltcliffe, an employee serving temporarily under her supervision, had made repeated racial and ethnic slurs about her colleagues. After respondent prepared termination charges against Biltcliffe, Biltcliffe used her political connections to press her case with several state and local officials, including

---

*Briefs of *amici curiae* urging reversal were filed for the City of Fall River, Massachusetts, by *Thomas F. McGuire, Jr.,* and *Mary E. O'Neil;* for the Massachusetts Municipal Association et al. by *George J. Leontire;* and for the National League of Cities et al. by *Richard Ruda* and *Charles Rothfeld.*

petitioner Marilyn Roderick, the vice president of the Fall River City Council. The city council held a hearing on the charges against Biltcliffe and ultimately accepted a settlement proposal under which Biltcliffe would be suspended without pay for 60 days. Petitioner Daniel Bogan, the mayor of Fall River, thereafter substantially reduced the punishment.

While the charges against Biltcliffe were pending, Mayor Bogan prepared his budget proposal for the 1992 fiscal year. Anticipating a 5 to 10 percent reduction in state aid, Bogan proposed freezing the salaries of all municipal employees and eliminating 135 city positions. As part of this package, Bogan called for the elimination of DHHS, of which respondent was the sole employee. The city council ordinance committee, which was chaired by Roderick, approved an ordinance eliminating DHHS. The city council thereafter adopted the ordinance by a vote of 6 to 2, with petitioner Roderick among those voting in favor. Bogan signed the ordinance into law.

Respondent then filed suit under Rev. Stat. § 1979, 42 U. S. C. § 1983, against the city, Bogan, Roderick, and several other city officials. She alleged that the elimination of her position was motivated by racial animus and a desire to retaliate against her for exercising her First Amendment rights in filing the complaint against Biltcliffe. The District Court denied Bogan's and Roderick's motions to dismiss on the ground of legislative immunity, and the case proceeded to trial. *Scott-Harris* v. *City of Fall River, et al.,* Civ. 91–12057–PBS (Mass., Jan. 27, 1995), App. to Pet. for Cert. 1.

The jury returned a verdict in favor of all defendants on the racial discrimination charge, but found the city, Bogan, and Roderick liable on respondent's First Amendment claim, concluding that respondent's constitutionally protected speech was a substantial or motivating factor in the elimina-

tion of her position.[1]  On a motion for judgment notwithstanding the verdict, the District Court again denied Bogan's and Roderick's claims of absolute legislative immunity, reasoning that "the ordinance amendment passed by the city council was an individually-targeted administrative act, rather than a neutral, legislative elimination of a position which incidentally resulted in the termination of plaintiff." *Id.*, at 20.

The United States Court of Appeals for the First Circuit set aside the verdict against the city but affirmed the judgments against Roderick and Bogan. *Scott-Harris* v. *Fall River*, 134 F. 3d 427 (1997).[2]  Although the court concluded that petitioners have "absolute immunity from civil liability for damages arising out of their performance of legitimate legislative activities," *id.*, at 440, it held that their challenged conduct was not "legislative," *id.*, at 441.  Relying on the jury's finding that "constitutionally sheltered speech was a substantial or motivating factor" underlying petitioners' conduct, the court reasoned that the conduct was administrative, rather than legislative, because Roderick and Bogan "relied on facts relating to a particular individual [respondent] in the decisionmaking calculus." *Ibid.*  We granted certiorari.  520 U. S. 1263 (1997).

## II

The principle that legislators are absolutely immune from liability for their legislative activities has long been recognized in Anglo-American law.  This privilege "has taproots

---

[1] Respondent dropped several other defendants from the suit, and the District Court directed a verdict in favor of defendant Robert Connors, the Fall River City Administrator.  Only the city, Bogan, and Roderick were appellants in the Court of Appeals, and only the latter two are petitioners in this Court.

[2] The court held that the city was not liable because the jury could reasonably infer unlawful intent only as to two of the city council members, and municipal liability could not rest "on so frail a foundation." 134 F. 3d, at 440.

in the Parliamentary struggles of the Sixteenth and Seventeenth Centuries" and was "taken as a matter of course by those who severed the Colonies from the Crown and founded our Nation." *Tenney* v. *Brandhove,* 341 U. S. 367, 372 (1951). The Federal Constitution, the Constitutions of many of the newly independent States, and the common law thus protected legislators from liability for their legislative activities. See U. S. Const., Art. I, § 6; *Tenney, supra,* at 372–375.

Recognizing this venerable tradition, we have held that state and regional legislators are entitled to absolute immunity from liability under § 1983 for their legislative activities. See *Tenney, supra* (state legislators); *Lake Country Estates, Inc.* v. *Tahoe Regional Planning Agency,* 440 U. S. 391 (1979) (regional legislators);[3] see also *Kilbourn* v. *Thompson,* 103 U. S. 168, 202–204 (1881) (interpreting the federal Speech and Debate Clause, U. S. Const., Art. I, § 6, to provide similar immunity to Members of Congress). We explained that legislators were entitled to absolute immunity from suit at common law and that Congress did not intend the general language of § 1983 to "impinge on a tradition so well grounded in history and reason." *Tenney, supra,* at 376. Because the common law accorded local legislators the same absolute immunity it accorded legislators at other levels of government, and because the rationales for such immunity are fully applicable to local legislators, we now hold that local legislators are likewise absolutely immune from suit under § 1983 for their legislative activities.

The common law at the time § 1983 was enacted deemed local legislators to be absolutely immune from suit for their legislative activities. New York's highest court, for example, held that municipal aldermen were immune from suit for

---

[3] The "regional" legislature in *Lake Country Estates* was the governing body of an agency created by a compact between two States to coordinate and regulate development in a region encompassing portions of both States. *Lake Country Estates* v. *Tahoe Regional Planning Agency,* 440 U. S., at 394.

their discretionary decisions. *Wilson* v. *New York*, 1 Denio 595 (1845). The court explained that when a local legislator exercises discretionary powers, he "is exempt from all responsibility by action for the motives which influence him, and the manner in which such duties are performed. If corrupt, he may be impeached or indicted, but the law will not tolerate an action to redress the individual wrong which may have been done." *Id.*, at 599.[4] These principles, according to the court, were "too familiar and well settled to require illustration or authority." *Id.*, at 599–600.

Shortly after § 1983 was enacted, the Mississippi Supreme Court reached a similar conclusion, holding that town aldermen could not be held liable under state law for their role in the adoption of an allegedly unlawful ordinance. *Jones* v. *Loving*, 55 Miss. 109, 30 Am. Rep. 508 (1877). The court explained that "[i]t certainly cannot be argued that the motives of the individual members of a legislative assembly, in voting for a particular law, can be inquired into, and its supporters be made personally liable, upon an allegation that they acted maliciously towards the person aggrieved by the passage of the law." *Id.*, at 111, 30 Am. Rep., at 509. The court thus concluded that "[w]henever the officers of a municipal corporation are vested with legislative powers, they hold and exercise them for the public good, and are clothed with

---

[4] The court distinguished "discretionary" duties, which were protected absolutely, and "ministerial" duties, which were not. Although the court described the former as "judicial" in nature, it was merely using the term broadly to encompass the "discretionary" acts of officials. See 1 Denio, at 599 ("[I]f his powers are discretionary, to be exerted or withheld, according to his own view of what is necessary and proper, they are in their nature judicial"). The legislators' actions in *Wilson* were unquestionably legislative in both form and substance. Thus, *Wilson* was widely, and correctly, cited as a leading case regarding *legislative* immunity. See, *e. g.*, T. Cooley, Law of Torts 377, n. 1 (1880) (hereinafter Cooley); F. Mechem, Law of Public Offices and Officers § 644, p. 431, n. 1 (1890) (hereinafter Mechem); M. Throop, Law Relating to Public Officers § 709, p. 671, n. 1 (1892).

all the immunities of government, and are exempt from all liability for their mistaken use." *Ibid.*

Treatises of that era confirm that this was the pervasive view. A leading treatise on municipal corporations explained that "[w]here the *officers of a municipal corporation* are invested with legislative powers, they *are exempt from individual liability* for the passage of any ordinance within their authority, and their motives in reference thereto will not be inquired into." 1 J. Dillon, Law of Municipal Corporations § 313, pp. 326–327 (3d ed. 1881) (emphasis in original). Thomas Cooley likewise noted in his influential treatise on the law of torts that the "rightful exemption" of legislators from liability was "very plain" and applied to members of "inferior legislative bodies, such as boards of supervisors, county commissioners, city councils, and the like." Cooley 376; see also J. Bishop, Commentaries on the Non-Contract Law § 744 (1889) (noting that municipal legislators were immune for their legislative functions); Mechem §§ 644–646 (same); Throop, *supra* n. 4, § 709, at 671 (same).

Even the authorities cited by respondent are consistent with the view that local legislators were absolutely immune for their legislative, as distinct from ministerial, duties. In the few cases in which liability did attach, the courts emphasized that the defendant officials lacked discretion, and the duties were thus ministerial. See, *e. g., Morris* v. *The People*, 3 Denio 381, 395 (N. Y. 1846) (noting that the duty was "of a ministerial character only"); *Caswell* v. *Allen*, 7 Johns. 63, 68 (N. Y. 1810) (holding supervisors liable because the act was "mandatory" and "[n]o discretion appear[ed] to [have been] given to the supervisors"). Respondent's heavy reliance on our decision in *Amy* v. *Supervisors*, 11 Wall. 136 (1871), is misguided for this very reason. In that case, we held that local legislators could be held liable for violating a court order to levy a tax sufficient to pay a judgment, but only because the court order had created a ministerial duty. *Id.*, at 138 ("The rule is well settled, that where the law re-

quires absolutely a ministerial act to be done by a public officer, and he neglects or refuses to do such act, he may be compelled to respond in damages to the extent of the injury arising from his conduct"). The treatises cited by respondent confirm that this distinction between legislative and ministerial duties was dispositive of the right to absolute immunity. See, e. g., Cooley 377 (stating that local legislators may be held liable only for their "ministerial" duties); Mechem § 647 (same).

Absolute immunity for local legislators under § 1983 finds support not only in history, but also in reason. See *Tenney* v. *Brandhove*, 341 U. S., at 376 (stating that Congress did not intend for § 1983 to "impinge on a tradition so well grounded in history and reason"). The rationales for according absolute immunity to federal, state, and regional legislators apply with equal force to local legislators. Regardless of the level of government, the exercise of legislative discretion should not be inhibited by judicial interference or distorted by the fear of personal liability. See *Spallone* v. *United States*, 493 U. S. 265, 279 (1990) (noting, in the context of addressing local legislative action, that "any restriction on a legislator's freedom undermines the 'public good' by interfering with the rights of the people to representation in the democratic process"); see also *Kilbourn* v. *Thompson*, 103 U. S., at 201–204 (federal legislators); *Tenney, supra*, at 377 (state legislators); *Lake Country Estates*, 440 U. S., at 405 (regional legislators). Furthermore, the time and energy required to defend against a lawsuit are of particular concern at the local level, where the part-time citizen-legislator remains commonplace. See *Tenney, supra*, at 377 (citing "the cost and inconvenience and distractions of a trial"). And the threat of liability may significantly deter service in local government, where prestige and pecuniary rewards may pale in comparison to the threat of civil liability. See *Harlow* v. *Fitzgerald*, 457 U. S. 800, 816 (1982).

Moreover, certain deterrents to legislative abuse may be greater at the local level than at other levels of government. Municipalities themselves can be held liable for constitutional violations, whereas States and the Federal Government are often protected by sovereign immunity. *Lake Country Estates, supra,* at 405, n. 29 (citing *Monell* v. *New York City Dept. of Social Servs.,* 436 U. S. 658 (1978)). And, of course, the ultimate check on legislative abuse—the electoral process—applies with equal force at the local level, where legislators are often more closely responsible to the electorate. Cf. *Tenney, supra,* at 378 (stating that "[s]elf-discipline and the voters must be the ultimate reliance for discouraging or correcting such abuses").

Any argument that the rationale for absolute immunity does not extend to local legislators is implicitly foreclosed by our opinion in *Lake Country Estates.* There, we held that members of an interstate regional planning agency were entitled to absolute legislative immunity. Bereft of any historical antecedent to the regional agency, we relied almost exclusively on *Tenney's* description of the purposes of legislative immunity and the importance of such immunity in advancing the "public good." Although we expressly noted that local legislators were not at issue in that case, see *Lake Country Estates,* 440 U. S., at 404, n. 26, we considered the regional legislators at issue to be the functional equivalents of local legislators, noting that the regional agency was "comparable to a county or municipality" and that the function of the regional agency, regulation of land use, was "traditionally a function performed by local governments." *Id.,* at 401–402.[5] Thus, we now make explicit what was implicit

---

[5] It is thus not surprising that several Members of this Court have recognized that the rationale of *Lake Country Estates* essentially settled the question of immunity for local legislators. See *Owen* v. *Independence,* 445 U. S. 622, 664, n. 6 (1980) (Powell, J., dissenting); *Lake Country Estates, Inc.* v. *Tahoe Regional Planning Agency,* 440 U. S. 391, 407–408 (1979) (Marshall, J., dissenting in part); see also *Spallone* v. *United States,* 493

in our precedents: Local legislators are entitled to absolute immunity from § 1983 liability for their legislative activities.

## III

Absolute legislative immunity attaches to all actions taken "in the sphere of legitimate legislative activity." *Tenney, supra,* at 376. The Court of Appeals held that petitioners' conduct in this case was not legislative because their actions were specifically targeted at respondent. Relying on the jury's finding that respondent's constitutionally protected speech was a substantial or motivating factor behind petitioners' conduct, the court concluded that petitioners necessarily "relied on facts relating to a particular individual" and "devised an ordinance that targeted [respondent] and treated her differently from other managers employed by the City." 134 F. 3d, at 441. Although the Court of Appeals did not suggest that intent or motive can overcome an immunity defense for activities that are, in fact, legislative, the court erroneously relied on petitioners' subjective intent in resolving the logically prior question of whether their acts were legislative.

Whether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it. The privilege of absolute immunity "would be of little value if [legislators] could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives." *Ten-*

U. S. 265, 278 (1990) (explaining that the same considerations underlying *Tenney* and *Lake Country Estates* applied to contempt sanctions against local legislators). In fact, the argument for absolute immunity for local legislators may be stronger than for the regional legislators in *Lake Country Estates,* because immunity was historically granted to local legislators and because the legislators in *Lake Country Estates* were unelected and thus less directly accountable to the public. See *Lake Country Estates, supra,* at 407 (Marshall, J., dissenting in part).

*ney*, 341 U. S., at 377 (internal quotation marks omitted). Furthermore, it simply is "not consonant with our scheme of government for a court to inquire into the motives of legislators." *Ibid.* We therefore held that the defendant in *Tenney* had acted in a legislative capacity even though he allegedly singled out the plaintiff for investigation in order "to intimidate and silence plaintiff and deter and prevent him from effectively exercising his constitutional rights." *Id.*, at 371 (internal quotation marks omitted).

This leaves us with the question whether, stripped of all considerations of intent and motive, petitioners' actions were legislative. We have little trouble concluding that they were. Most evidently, petitioner Roderick's acts of voting for an ordinance were, in form, quintessentially legislative. Petitioner Bogan's introduction of a budget and signing into law an ordinance also were formally legislative, even though he was an executive official. We have recognized that officials outside the legislative branch are entitled to legislative immunity when they perform legislative functions, see *Supreme Court of Va.* v. *Consumers Union of United States, Inc.*, 446 U. S. 719, 731–734 (1980); Bogan's actions were legislative because they·were integral steps in the legislative process. Cf. *Edwards* v. *United States*, 286 U. S. 482, 490 (1932) (noting "the legislative character of the President's function in approving or disapproving bills"); *Smiley* v. *Holm*, 285 U. S. 355, 372–373 (1932) (recognizing that a Governor's signing or vetoing of a bill constitutes part of the legislative process).

Respondent, however, asks us to look beyond petitioners' formal actions to consider whether the ordinance was legislative in *substance*. We need not determine whether the formally legislative character of petitioners' actions is alone sufficient to entitle petitioners to legislative immunity, because here the ordinance, in substance, bore all the hallmarks of traditional legislation. The ordinance reflected a discretionary, policymaking decision implicating the budgetary pri-

orities of the city and the services the city provides to its constituents. Moreover, it involved the termination of a position, which, unlike the hiring or firing of a particular employee, may have prospective implications that reach well beyond the particular occupant of the office. And the city council, in eliminating DHHS, certainly governed "in a field where legislators traditionally have power to act." *Tenney, supra,* at 379. Thus, petitioners' activities were undoubtedly legislative.

*     *     *

For the foregoing reasons, the judgment of the Court of Appeals is reversed.[6]

*It is so ordered.*

---

[6] Because of our conclusion that petitioners are entitled to absolute legislative immunity, we need not address the third question on which we granted certiorari: whether petitioners proximately caused an injury cognizable under § 1983.