NYGAARD, J.,
dissenting.
I respectfully dissent. In my view, the majority holding expands the legislative immunity privilege to insulate almost every action taken by executive branch officials having some connection, however remote, with the passage of legislative acts, *212 subsumes in part the qualified immunity-doctrine, and effectively abolishes accepted causes of action against executive branch officials who meddle in the affairs of, or otherwise insinuate themselves into, the legislative process.[19] I therefore dissent from that portion of the majority opinion which extends legislative immunity to former Governor McGreevey and Chairperson Harrington.
History and precedent make two things clear: First, there is no support for the claim that the protection afforded to legislators applies coextensively to non-legislators. Thus, the Majority’s implication that the fact that Governor McGreevey and Ms. Harrington are not members of the New Jersey legislature is immaterial; and that they were acting in a legislative capacity when they “orchestrate!] and direet[]” bills through the legislature stands starkly at odds with both governing jurisprudence and the history of the doctrine. Second, by extending the protections of legislative immunity to non-legislators who do more than propose legislation, but who “orchestrate[] and direct[]” legislative activities, the majority critically weakens the very foundation of the privilege, portending far-reaching results for both the vitality of the privilege and for its effect on the separation of powers.
Historically, the Speech and Debate Clause, from which legislative immunity is derived, was intended to preserve the independence and integrity of the Legislature from the Executive. It was designed to prevent other branches of the government from interfering with the legislators in the performance of their duties.[20] As Justice Harlan taught, “since the Glorious Revolution in Britain, and throughout United States history, the privilege has been recognized as an important protection of the independence and integrity of the legislature. In the American governmental structure the clause serves the additional function of reinforcing the separation of powers so deliberately established by the Founders.” United States v. Johnson, 383 U.S. 169, 176, 86 S.Ct. 749, 754, 15 L.Ed.2d 681 (1966) (citing Story, Commentaries on the Constitution; II The Works of James Wilson 37-38 (Andrews ed. 1896)).
Given that the doctrine of legislative immunity derives from a clause located in Article I, I infer that its goal is to protect the Legislative branch from improper and untoward intrusions by non-legislators from either of the coordinate branches of government. Indeed, even when the question arises as to what conduct by legislators qualifies for immunity, the Supreme Court has cautioned that, “the courts have extended the privilege to matters beyond pure speech or debate in either House, but *213 only when necessary to prevent indirect impairment of such deliberations.” Gravel v. United States, 408 U.S. 606, 625, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972). Here, instead of protecting the legislature from impairment of its deliberations, we are insulating executive intrusions into the function and deliberations of the legislature from suit. Importantly, the Supreme Court has specifically instructed that:
the heart of the clause is speech or debate in either House, and insofar as the clause is construed to reach other matters, they must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.
Id. Legislative immunity, as derived from the Speech and Debate Clause, is meant to apply to the legislative branch of government, not all who prowl the legislative halls to importune legislators on some pet cause or another.
The bedrock of our system of government is political competition between the legislative and executive branches. Put in more familiar parlance, Congress and the President would “check” and “balance” each other. The Framers believed that “the great problem to be solved” was to design governing institutions that would afford “practical security” against the excessive concentration of political power. The Federalist Papers No. 48 (Madison). As Madison explained, “a mere demarcation on parchment of the constitutional limits of the several departments is not a sufficient guard against those encroachments which lead to a tyrannical concentration of all the powers of government in the same hands.” Id. at 308. As Professors Levinson and Pildes have pointed out, “the solution to this great problem was, instead, to link the power-seeking motives of public officials to the interests of their branches.” Daryl J. Levinson and Richard H. Pildes, Separation of Parties, Not Powers, 119 Harv. L.Rev. 2311, 2316-17 (June 2006). By giving “those who administer each department the necessary constitutional means and personal motives to resist encroachments of the others,” the Framers hoped to create a system in which competition for power among the branches would constrain each safely within its bounds. Id. (citing The Federalist Papers No. 51 (Madison), at 321-22).
Of course, it might be argued that the type of behavior at issue here is akin to such acts as preparing investigative reports, addressing a congressional committee, and speaking before a legislative body in session, all of which are accorded the imprimatur of legislative immunity. But, it is not. We have limited legislative immunity “to include activities that are an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.” Youngblood, 352 F.3d at 840 (quoting Gravel, 408 U.S. at 625, 92 S.Ct. 2614 (1972)) (my emphasis). Nonetheless and conversely, legislative immunity will not extend “to acts that are casually or incidentally related to legislative affairs but not part of the legislative process itself.” Youngblood, 352 F.3d at 840 (quoting Brewster, 408 U.S. at 513, 92 S.Ct. 2531). Thus, to me, activities such as “orchestrating] and directing]” the New Jersey legislature into passing a personally targeted piece of legislation — be they undertaken by a governor or ordinary citizen — are activities which may be casually *214 and incidentally related to legislative affairs, but are not part of the legislative process itself. I would not take garden variety lobbying activity, even if undertaken by a state governor and his representative, and place such activity under the absolute protection of the privilege.
I agree with the majority that the New Jersey Constitution permits the Governor to recommend legislation to the General Assembly. But this does not support the majority’s conclusion that the Governor’s actions in “recommending” legislation is “formally legislative” and entitled to the protection of a legislative privilege. In my view the Constitutional prescription that a New Jersey governor may recommend legislation does not provide Constitutional imprimatur for him or other non-legislators, to “orchestrate! ] and direct! ]” the legislative process. I respectfully submit that the doctrine’s scope as it applies to non-legislators simply does not map as the majority would have it, from its application to legislators, and, additionally, that there is no immunity for practices that merely relate to legislative activities. Instead, the central inquiry for non-legislators is whether the official was performing legislative functions, which the Supreme Court in Bogan v. Scott-Harris defined as acts that were “integral steps in the legislative process.” Bogan, 523 U.S. 44, 55, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998) (citing Edwards v. United States, 286 U.S. 482, 490, 52 S.Ct. 627, 76 L.Ed. 1239 (1932)).[21]
I also agree with the majority that formal aspects necessary to the legislative process — introduction of a bill and signing it into law — qualify for legislative immunity. But here, the governor and his aide went far beyond that. We have repeatedly cautioned that “a public official’s legislative immunity from suit attaches only to those acts undertaken in a legislative capacity. It is only with respect to the legislative powers delegated to them by the state legislatures that [non-legislative officials] are entitled to absolute immunity.” Carver, 102 F.3d at 100 (my emphasis). “Absolute legislative immunity attaches to all actions taken in the sphere of legitimate legislative activity.” Bogan v. Scott-Harris, 523 U.S. 44, 54, 118 S.Ct. 966, 140 L.Ed.2d 79 (1998) (quoting Tenney v. Brandhove, 341 U.S. 367, 376, 71 S.Ct. 783, 95 L.Ed. 1019 (1951)) (my emphasis). But the key questions following Bogan are, what is legitimate — what is legislative? Indeed, even for actual legislators, the Supreme Court has rejected a reading of the doctrine that would cover everything “related to the due functioning of the legislative process.” United States v. Brewster, 408 U.S. 501, 513, 92 S.Ct. 2531, 33 L.Ed.2d 507 (1972). Immunity includes “activities that are an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House.” Youngblood, 352 F.3d at 840 (quoting Gravel v. United States, 408 U.S. 606, 625, 92 S.Ct. 2614, 33 L.Ed.2d 583 (1972)). Conversely, legislative immunity will not extend “to acts that are casually or incidentally related to legislative affairs but not part of the legislative process itself.” Youngblood, 352 F.3d at *215 840 (quoting Brewster, 408 U.S. at 513, 92 S.Ct. 2531).
Because the roots of legislative immunity seek to protect the quintessentially legislative process, the doctrine should protect action that might be inhibited, frustrated or impaired by the threat of suit where that action is central to the legislative process. Viewed in this way, it is clear that broad extension of the doctrine advocated by the majority to non-legislators’ actions does not show true fidelity to the underlying basis of the doctrine, which is to protect the legislative process, and would not follow the Supreme Court’s caution that the doctrine be extended only when necessary to prevent impairment of the legislative function. Accordingly, I believe that only actions that are “integral steps in the legislative process,” acts that are inextricably linked to, and necessary for, the passage of legislation are entitled to protection. I conclude that the actions averred in Baraka’s complaint are not “integral steps in the legislative process,” and, therefore, I would reverse the District Court.[22]
Finally, I point out that by concluding that McGreevey and Harrington are not entitled to absolute legislative immunity, we do not deprive them of other valid defenses. Qualified immunity remains not only a robust defense, but is the appropriate one where defendants are public officials in the executive branch. See Dotzel v. Ashbridge, 438 F.3d 320, 326 n. 3 (3d Cir.2006). It may be true that McGreevey and Harrington should be protected for their role in orchestrating and directing the passage of the bill about which Baraka complains; however, the appropriate defense for them is qualified immunity — not absolute legislative immunity.
Hence, I must respectfully dissent.

. There is no disagreement on this fact. What the majority specifically holds is that the actions which fall within the legislative immunity doctrine are Governor McGreevey’s "orchestration] and direction] [of] the New Jersey legislature to abolish the position of Poet Laureate.” Maj. Op. at 196.

. The Speech and Debate Clause in Article I, Section 6, of our Constitution is the product of a long lineage of free speech or debate guarantees that began with the English Bill of Rights of 1689, continued on to some of the first state constitutions, and also appeared in the Articles of Confederation. Id. (citing Tenney v. Brandhove, 341 U.S. 367, 372-75, 71 S.Ct. 783, 95 L.Ed. 1019 (1951)). Because the principle was so firmly rooted, there was little discussion of the clause during the debates of the Constitutional Convention and it was hardly mentioned at all in the ratification debates. Id. Specifically, the Speech and Debate Clause provides that, "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place.” U.S. Const. Art. I, Sect. 6, cl. 1; see also Youngblood v. DeWeese, 352 F.3d 836, 839 (3d Cir.2004).

. The majority’s opinion ignores the question of whether McGreevey’s and Harrington's actions are "integral steps in the legislative process,” focusing instead on whether their actions were undertaken within the "sphere of legislative activity.” See Bogan, 523 U.S. at 54, 118 S.Ct. 966. Many actions can be said to take place within the sphere of legislative activity — including lobbying. That does not mean, however, that all such actions are entitled to legislative immunity.

. The District Court grasped onto language contained within a 1994 District Court case, Hughes v. Lipscher, 852 F.Supp. 293 (D.N.J. 1994), for the proposition that "[(Individuals who are not legislators but whose acts have a substantial legislative nexus are also imbued with this absolute legislative immunity.” Hughes, 852 F.Supp. at 296. To the extent that it overreads and over-extends the scope of the immunity doctrine, it should be affirmatively rejected. Nowhere has this standard been explicitly advocated or adopted, espe-daily not in the case cited for it support, Gravel. The "substantial nexus” test would envelop a much too broad set of behavior under the doctrine, allowing non-legislators to claim legislative immunity for acts not just integral to the legislative process generally (such as the signing or introducing of a bill) but also for acts that could be seen as lobbying, politicking, and the like. The doctrine was plainly not intended to cover such behavior, even for legislators.