**NOT PRECEDENTIAL**

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 11-4017
_____

CRAIG KALINOSKI

v.

*LACKAWANNA COUNTY;
COREY O'BRIEN; MICHAEL WASHO,

Appellants


*Dismissed pursuant to Court's Order of December 22, 2011
_____

On Appeal from the United States District Court
for the Middle District of Pennsylvania
(D.C. No. 3:10-cv-00314)
District Judge:  Honorable A. Richard Caputo
_____

Argued November 15, 2012

Before:  RENDELL, FUENTES, and CHAGARES, <u>Circuit Judges</u>.

(Filed: January 18, 2013)

Deborah H. Simon, Esq. (Argued)
Elliott Greenleaf & SiedIkowski
925 Harvest Drive, Suite 300
Union Meeting Corp. Ctr. V
Blue Bell, PA  19422

John G. Dean, Esq.
Joseph J. Joyce, III, Esq.
Elliott Greenleaf & Dean
201 Penn Avenue, Suite 202
Scranton, PA  18503
          Attorneys for Appellants

Peter D. Winebrake, Esq. (Argued)
R. Andrew Santillo, Esq.
Winebrake and Santillo, LLC
715 Twining Road, Suite 211
Dresher, PA  19025
          Attorneys for Appellee

_____

OPINION
_____

CHAGARES, Circuit Judge.

Craig Kalinoski brought claims under 42 U.S.C. § 1983 against Corey O'Brien,

Michael Washo, and Lackawanna County alleging that they violated his First

Amendment rights when they terminated his employment with the Lackawanna County

Office of the Public Defender.  O'Brien and Washo[1] now appeal the District Court's

denial of summary judgment in their favor.  For the reasons discussed below, we will

vacate the District Court's ruling and remand.

I.

Because we write solely for the benefit of the parties, we recount only those facts

that are relevant to our disposition.  The Lackawanna County Board of Commissioners is

made up of three county commissioners:  two majority party commissioners and one

---

[1] Pursuant to the Court's December 22, 2011 Order, Lackawanna County is no longer a
party to this appeal.

minority party commissioner. In 2007, O'Brien and Washo (collectively "defendants"), who are Democrats, were elected as majority commissioners. Their platform included a promise to increase the transparency of local government, in part by conducting a more open hiring process.

After winning the general election but before their inauguration, O'Brien and Washo formed a variety of advisory transition teams to study local departments and make suggestions on how to improve services and save money. The defendants asked former Chief Public Defender Gerard Karam, Robert Munley, Karam's former assistant, Christopher Munley, an attorney, and Jeffrey Nepa, also an attorney, to examine the Office of the Public Defender, where plaintiff Kalinoski, a Republican, had served as a public defender since 2004. The four men who made up this transition team all supported the defendants' political campaign in one way or another: Karam and Munley performed free legal work and assisted with fundraising; Nepa also assisted with fundraising; and all four donated to the campaign.

In evaluating the Office of the Public Defender (the "Office"), members of the transition team spoke with judges and other attorneys, and made use of their own experiences in the Lackawanna County court system. The problems they identified at the Office of the Public Defender included the low number of matters proceeding to trial, the difficulty judges experienced locating public defenders during the work day, a lack of experience among the attorneys, and the specific lack of death penalty certified attorneys. Because the county was facing a serious budget deficit, the defendants also asked the advisory transition team to consider ways to cut the Office's budget. The team

3

concluded, however, that it would be impossible to cut the budget without seriously impairing the Office's ability to provide necessary services to indigent defendants.[2]

In order to improve the Office, the team suggested restructuring it by making the Chief Public Defender's job a full-time position and funding three full-time assistant public defender positions and eight part-time assistant public defender positions. This represented an elimination of seven full-time assistant public defender positions, one of which Kalinoski held. Karam presented these ideas to the defendants in an email dated December 12, 2007, and in person in January 2008, likely after the defendants' inauguration. The email contained only suggestions related to the restructuring of the office, but the meeting also covered specific personnel recommendations.

After receiving the team's structural recommendations, the defendants placed advertisements in local papers inviting people to apply for new county positions and posted open job positions online. News that the county was accepting applications also spread through word-of-mouth. After speaking with several people including Larry Moran, who Kalinoski believed was in charge of hiring, about possible upcoming changes at the Office of the Public Defender, Kalinoski submitted his application to the county, seeking either the First Assistant Public Defender position or one of the full-time

---

[2] The transition team advised the defendants that its proposed restructuring could be "done within the current budget for the office." Appendix ("App.") 836. The final approved budget, though, was actually $100,000 more than the 2007 budget for the Office of the Public Defender. Id. 622-23. At oral argument, counsel for defense explained that this difference was accounted for by the elimination of the chief conflicts lawyer position, whose salary had been allocated to a different department's budget, and the transfer of that money into the Office of the Public Defender budget. See also id. 282-83.

4

assistant positions. There were at least twenty-nine applicants who sought one or more of the open positions. App. 589-92.

The transition team reviewed the resumes received and considered feedback from judges and others on the applicants, who included both current members of the Office of the Public Defender and outsiders. They also took into account their own experiences with the applicants, but did not conduct formal interviews, solicit formal letters of recommendation, or collect writing samples. At the January 2008 meeting, at which at least Karam and the defendants were present, Karam conveyed the transition team's recommendations to O'Brien and Washo. O'Brien then incorporated the team's recommendations, including specific personnel suggestions, into a proposed budget document entitled "The Washo-O'Brien Hiring Chart" that the defendants sent to the county's budget director for approval in advance of the official budget vote.

The chart was a working document that dealt with a variety of departments and listed positions, employees, salaries, and benefits under the 2007 budget and under the defendants' proposed 2008 budget. The chart indicated that some positions under the 2007 budget were to be eliminated ("Eliminated Position[s]"), while other positions were paired with positions included in the proposed 2008 budget. See, e.g., App. 606. There was no "Eliminated Position" label next to Kalinoski's position on the chart. Instead, the chart listed Kalinoski's 2007 "Asst Public Defender" position with the "Asst Public Defender (Full-Time)" position that was assigned to Tim McGraw under the defendants' proposed budget. Id. 610.

5

Ultimately, Kalinoski was not retained by the Office of the Public Defender. He contends that he should have been hired as one of the three full-time assistant public defenders, a position similar to the assistant public defender position he had held under the previous Republican majority commissioners.[3] The attorneys that the team recommended for those positions were Joseph ("Jody") Kalinowski (no relation to Kalinoski), Dominic Mastri, and Tim McGraw. Kalinowski and Mastri had served as public defenders during the previous administration, while McGraw was an outside hire. The transition team had heard positive feedback about McGraw, Mastri, and Kalinowski. McGraw also had personal ties to individuals who had supported the defendants in their election campaign. There were no specific performance complaints regarding Kalinoski, but the team had heard that Kalinoski was "conflicted out" of too many cases from one of the two local judges with whom it had spoken. Team members Nepa and Karam also reported that they had had bad experiences with Kalinoski.

The new head of the Office of the Public Defender, Sidney Prejean, accepted the position in the second week of January 2008, and it fell to him to inform Kalinoski that he would no longer have a position in the Office of the Public Defender. On January 28, 2008, before the O'Brien-Washo budget that eliminated Kalinoski's position was formally approved, Prejean informed Kalinoski that his position had been eliminated, but assured him that he had never heard any complaints about Kalinoski's performance, and

---

[3] Kalinoski also suggests that he should have been considered for a part-time position, but there is no evidence that he submitted an application for a part-time position. See App. 1323-28.

6

that, as far as Prejean had seen or heard, Kalinoski was a good attorney. Two days later, the O'Brien-Washo budget was approved by the county at a public vote.[4]

In the months leading up to the Lackawanna County general election, Kalinoski had encountered both O'Brien and Washo. During both encounters, the candidates and Kalinoski discussed Kalinoski's work with the Office of the Public Defender and the candidates asked Kalinoski for his support. Both times, Kalinoski indicated that he supported the defendants' opponents. Believing that he lost his position in the Office of the Public Defender either because he had supported the defendants' opponents in the county election or in order to make room for the defendants to hire their political supporters, Kalinoski filed suit along with Thomas Bradley and Kenneth Kovaleski, two other public defenders who were not retained by the new administration, under § 1983 claiming that their First Amendment rights had been violated. These suits were consolidated with a later action brought against Lackawanna County by other former employees. After Kalinoski retained a separate attorney, his suit was severed from the consolidated action.

O'Brien, Washo, and the county filed a motion to dismiss the claims, in part asserting legislative immunity. The District Court converted the motion to a motion for summary judgment and held that O'Brien and Washo were not entitled to legislative immunity, a ruling that O'Brien and Washo now appeal. In denying the defendants

---

[4] Although the parties do not dispute that the budget was approved at a public vote, we note that the only record evidence that this occurred was a Lackawanna County Board of Commissioners Meeting Agenda, dated January 30, 2008, and a Lackawanna County Final Budget labeled "Adopted January 30, 2008."

legislative immunity, the District Court held that although the defendants had demonstrated that Kalinoski's termination was substantively legislative, there was insufficient evidence to demonstrate that it was also procedurally legislative, as is required under the legislative immunity doctrine. Kalinoski v. Lackawanna Cnty., 3:10-CV-0314, 2011 WL 4048531, at *4-5 (M.D. Pa. Sept. 12, 2011).

II.

The District Court had jurisdiction over this case pursuant to 28 U.S.C. § 1331. We have jurisdiction over the District Court's order denying the defendants absolute immunity under 28 U.S.C. § 1219 because, although this Court does not ordinarily have jurisdiction to review a lower court's denial of summary judgment, when the summary judgment motion is premised on absolute immunity, "the district court's denial is immediately appealable because it falls within the collateral order doctrine." Carver v. Foerster, 102 F.3d 96, 98 (3d Cir. 1996). Absolute legislative immunity is a purely legal question over which we exercise plenary review. Id. at 99.

"Under the Supreme Court's functional test of absolute legislative immunity, whether immunity attaches turns not on the official's identity, or even on the official's motive or intent, but on the nature of the act in question." In re Montgomery Cnty., 215 F.3d 367 (3d Cir. 2000). When the district court determine whether legislative immunity attaches to a municipal actor who has engaged in arguably administrative activities, it is to apply a two-part test that asks whether the municipal actor's actions were both substantively and procedurally legislative. Baraka v. McGreevey, 481 F.3d 187, 198 (3d Cir. 2007). This test is designed to protect acts that are "within the sphere of legitimate,

8

legislative activity," and in applying the test the court must look only at the acts themselves "stripped of all considerations of intent and motive." Id. (citing Bogan v. Scott-Harris, 523 U.S. 44, 55 (1998)).

A.

We have explained that acts are substantively legislative when they "involve policy-making decision[s] of a general scope or, to put it another way, legislation involves linedrawing." Gallas v. Superior Court of Pa., 211 F.3d 760, 774 (3d Cir. 2000) (quoting Ryan v. Burlington Cnty., 889 F.2d 1286, 1290-91 (3d Cir. 1989)) (quotation marks omitted). Conversely, where a decision "affects a small number or a single individual" rather than the general public, the decision is administrative rather than legislative. Id. This distinction has led us to distinguish between eliminating a position and terminating an individual employee, characterizing the former as legislative and the latter as administrative. Baraka, 481 F.3d at 199-200 (citing cases).

The Baraka case involved the claim by Amiri Baraka, a former New Jersey poet laureate, that his First Amendment right to free speech had been violated when, in reaction to a poem he had read at a poetry festival that many found racist and anti-Semitic, the state passed a law abolishing the state's poet laureate position. Id. at 194. Baraka brought claims against the state of New Jersey and against a variety of state officials, including then-Governor McGreevey. We affirmed the lower court's dismissal of the claims against Governor McGreevey on the basis of absolute legislative immunity. Noting earlier cases that drew a "distinction between the elimination of a position and the termination of an individual employee," we reasoned that the elimination of a position

9

was the type of policy-making that "traditional legislation entails." Id. at 199-200. Citing recent Supreme Court precedent, we further noted that McGreevey's motivation in enacting the law eliminating the poet laureate position, whether concerned specifically with Baraka or with more global public concerns, was immaterial. Id. at 200 (citing Bogan, 523 U.S. at 54-55).

The defendants persuasively argue that, following the logic in Baraka, the decision to restructure the Office of the Public Defender was legislative; it was a long-lasting change designed to affect the quality of services offered to the public at large. The defendants did not simply fire Kalinoski and hire a new attorney in an identical position; they eliminated his position outright. The case is therefore unlike In re Montgomery County, 215 F.3d 367 (3d Cir. 2000), the case relied upon by Kalinoski, because the plaintiff in Montgomery County was fired because of his poor performance and ethically questionable acts independent from any restructuring of his department or elimination of his position. Id. at 376-77.[5]

Under Supreme Court and Third Circuit precedent, it is clear that the restructuring of the Office of the Public Defender and corresponding elimination of Kalinoski's position was substantively legislative in character.

B.

The remaining question is whether it was also procedurally legislative. An act is procedurally legislative when it is "passed by means of established legislative

---

[5] Because Kalinoski challenges only the restructuring of the office and elimination of his position and not the subsequent hiring process, we need not address the hiring decisions made by the defendants at the recommendation of the transition team.

procedures." Gallas, 211 F.3d at 774. This requirement limits the grant of immunity to legislative acts that follow constitutionally accepted procedures, assuring that immune acts are legitimate and reasoned decisions that represent the will of the people. Id. Immunity is not limited to only the actual casting of legislative votes, but encompasses "all aspects of the legislative process, including the discussions held and alliances struck regarding a legislative matter in anticipation of a formal vote." Almonte, 478 F.3d at 107. Further, that such advance discussions or meetings may be conducted behind closed doors or be politically motivated does not erase the "legislative character of the process." Id.

As the District Court correctly recognized, this is the critical issue in this case. The defendants argue that the county's charter empowered the defendants as county commissioners to adopt an annual budget, see 335 Pa. Code § 1.3-302(b), and that the same section of the charter also grants commissioners the power "to establish, abolish or reorganize departments and/or programs to promote efficiency and economy." Id. § 1.3-302(l). This, in addition to the vote approving the budget, they suggest, is sufficient to satisfy the procedural prong. The power to act, though, is not the same as acting according to an established legislative procedure, as is necessary to satisfy the legislative immunity prong.

There are a variety of procedures in the Lackawanna County Home Rule Charter that the commissioners may have had to comply with when making budgetary and personnel decisions. For example, section 1.3-309 provides that "[a]ctions of the Board which are legislative in nature shall be by ordinance," while the previous section provides

11

that an ordinance may not be finally adopted at the meeting at which it is first introduced and that adoption of an ordinance or amendment "may occur no sooner than the next following regular or special meeting of the Board held at least six (6) days after the proposed ordinance or amendment was introduced." Id. § 1.3-308. Moreover, under section 1.3-306, the vote on any board action "shall be by roll call unless there is unanimity," while section 1.3-307 provides that persons must be afforded the opportunity to address the Board regarding an ordinance before it may be adopted. The Home Rule Charter also contains a list of requirements for budgets, including that they list all estimated income, all proposed expenditures, and the number of proposed employees in every job classification. Id. § 1.2-1204. In addition to the provisions cited above, at oral argument we also raised questions about whether the fact that Kalinoski was terminated before the budget amendment was passed had any import and whether Home Rule Charter provisions discussing the role of the Salary Board, see, e.g., 335 Pa. Code § 1.2-204 (providing that salaries other than those of elected officers "shall be determined by the Salary Board"), had any application here and what role, if any, the Salary Board had played.

While compliance with such procedures might be enough to satisfy the procedural prong of the legislative immunity test, there is a dearth of evidence as to whether such procedures were, first, required and, second, complied with in this case. The record is so incomplete in fact, that until counsel mentioned it at oral argument, we were unaware that the defendants' budget proposal was actually a proposed amendment to the budget that had been passed by the out-going county commissioners and not simply a proposed

12

budget. Given that the record did not clarify that the defendants' proposal was an amendment, it is not surprising that there is also a dearth of information as to what procedures govern the budget amendment process in Lackawanna County and whether the defendants acted in accordance with any such procedures.

We do not find fault with the District Court's conclusion that there was inadequate evidence to support the granting of legislative immunity. All that the record suggests is that notice of the impending budgetary vote was published and that the County Board of Commissioners voted to approve the budget. Quite simply, this is not enough to demonstrate that Kalinoski lost his job as the result of acts that were carried out according to "established legislative procedures." Gallas, 211 F.3d at 774.

Given the obvious hole in the record, we will vacate the District Court's Order denying legislative immunity and remand the case to allow both sides the opportunity to explain what legislative procedures did or did not govern the defendants' acts and whether the defendants' budget that resulted in Kalinoski's termination was passed by means of established legislative procedures, and to permit the District Court to consider this issue on an expanded record.[6]

## III.

For the foregoing reasons, we will vacate the District Court's denial of legislative immunity and remand for further proceedings.

---

[6] While we would normally either affirm or reverse a denial of immunity, we believe the disposition we order is appropriate in order to service the purpose of immunity appeals, i.e., to avoid trials if immunity should be afforded. Here, we believe it better to decide that issue on the adequate record, rather than subject the parties to trial, if indeed immunity exists.

13