In the

# United States Court of Appeals
### For the Seventh Circuit

_____

No. 18-2175

WILLIAM "SAM" MCCANN and
BRUCE ALAN MCDANIEL,

*Plaintiffs-Appellants*,

*v.*

WILLIAM E. BRADY, in his official capacity as
Minority Leader of the Illinois State Senate,

*Defendant-Appellee*.

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 18 C 3115 — **Andrea R. Wood**, *Judge*.

_____

ARGUED OCTOBER 30, 2018 — DECIDED NOVEMBER 26, 2018

_____

Before WOOD, *Chief Judge*, and SYKES and BARRETT, *Circuit Judges*.

WOOD, *Chief Judge*. This case takes us deep into the internal workings of the Illinois State Senate. After Senate Minority Leader William E. Brady (a Republican) decided to oust William ("Sam") McCann from the Illinois Senate Republican Caucus and thereby to deny certain resources to McCann,

McCann and one of his constituents, Bruce Mcdaniel, sued Brady under 42 U.S.C. § 1983 for alleged deprivations of their rights under the First Amendment and the Equal Protection Clause of the federal Constitution. Brady responded with a motion to dismiss on the basis of legislative immunity. The district court agreed that this doctrine blocks all of McCann and Mcdaniels's theories and dismissed the case. We affirm.

**I**

In order to understand why McCann sued, a brief review of some organizational features of the Illinois General Assembly is necessary. Article IV, § 1 of the Illinois Constitution vests legislative power in "a General Assembly consisting of a Senate and a House of Representatives." It also stipulates that at the beginning of the General Assembly's January session in odd-numbered years, "the Governor shall convene the Senate to elect from its membership a President of the Senate as presiding officer." ILL. CONST. art. IV, § 6(b). The state constitution also provides for a Minority Leader of the Senate, who must be "a member of the numerically strongest political party other than the party to which … the President belongs." *Id.* § 6(c).

Senate rules also enter our picture. Rule 1-10 defines the term "majority caucus" to include "that group of Senators from the numerically strongest political party in the Senate" plus anyone who voted for the President of the Senate. The "minority caucus" is defined as "that group of Senators from other than the majority caucus." Rule 1-16.

These groups are important for many reasons, but our concern is with the way they are treated for purposes of legislative funding. The state budget includes appropriations for

legislative operations, including those of the Senate. 15 ILCS 20/50-22(b). In 2017, the General Assembly appropriated approximately $20 million for "the ordinary and incidental expenses" of both the Senate and the House legislative leadership and associated staff, half to the Senate and half to the House. Half of the Senate's share (one-fourth of the total) was designated for the Senate Minority Leader. In addition, pursuant to the Illinois General Assembly Staff Assistants Act, 25 ILCS 160/1a, legislators are authorized to hire staff assistants. Again, half go to each House, and of those designated for the Senate, half are designated by the Minority Leader. Finally, each Senator is authorized to spend $73,000 per year (adjusted for inflation) on personal assistants, office needs, and the like. 25 ILCS 115/4.

In 2010 McCann was elected on the Republican ticket to Illinois's 50th Senate District, which is in the southwest part of the state. For the first five years of his service, he participated in the Minority and Republican Caucuses. In 2015, he voted to override Governor Bruce Rauner's veto of Senate Bill 1229, which related to public-employee collective bargaining. Governor Rauner then supported McCann's opponent in the 2016 Republican primary election, but McCann won the primary and sailed back into office unopposed in the general election. In early 2018, facing a primary opponent and disillusioned with Governor Rauner, McCann announced his intention to run for governor under the banner of a new party. (He carried through with that plan by running as a member of the Conservative Party, but he lost in the 2018 election to the Democratic Party's candidate, J.B. Pritzker.)

Minority Leader Brady interpreted McCann's announcement as a *de facto* resignation from the Republican party. McCann said that it was no such thing, at least for the time during which he was working on establishing his new party. But Brady promptly expelled McCann from the Senate Republican Caucus. This had the effect, McCann asserts, of cutting off his access to a wide array of services enjoyed by Republican and Minority Caucus members, including staff analysis of bills, the coordination and movement of active bills, drafting assistance for a senator's own bills, detailed status reports and schedules, and help with communications, photography, in-district events, and other constituent services. We refer to these in the aggregate as the Party Resources.

McCann greeted Brady's decision with dismay. In his view, without access to the Party Resources that Brady controlled, he could no longer effectively perform his duties as a senator. Those duties included moving along 24 bills for which he was a primary sponsor, serving on a number of senate committees and sub-committees, and representing his constituents' interests during the (contentious) negotiations over Illinois's budget. Although he concedes that he still has access to his modest allotment for personal staff and to publicly available information about scheduling and bill movement, that is a poor substitute for the many resources from which he is now barred.

Upon filing this suit, McCann and his constituent Mcdaniel asked for a temporary restraining order requiring the restoration of his access to the Party Resources. The district court concluded that their likelihood of success on the merits was negligible, because Brady was protected by absolute legislative immunity from suit. It therefore denied their request for

a TRO and at the same time dismissed the suit with prejudice. (The plaintiffs had also sued the Illinois Senate Republican Caucus itself, but that body never appeared, and all claims against it have now been dismissed with prejudice. We thus have no more to say about that part of the case.)

## II

This case turns on the scope of legislative immunity, and so we begin with a brief discussion of that doctrine. At the federal level, the doctrine is reflected in the Speech or Debate Clause found in Article I, section 6, clause 1 of the Constitution. That Clause says simply that Senators and Representatives "for any Speech or Debate in either House, … shall not be questioned in any other Place." The scope of the Clause, however, "extend[s] beyond mere discussion or speechmaking on the legislative floor." *Reeder v. Madigan*, 780 F.3d 799, 802 (7th Cir. 2015). Even so, there are limits: it applies only to "legislators acting in their legislative capacity." *Rateree v. Rockett*, 852 F.2d 946, 950 (7th Cir. 1988). Actions taken in an administrative capacity are therefore not protected. The Supreme Court has held that "[w]hether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998).

*Bogan* is an important case for our purposes, because it confirms that legislative immunity is not something that is confined to federal legislators. Indeed, the Court opened its opinion in *Bogan* with the statement that "[i]t is well established that federal, state, and regional legislators are entitled to absolute immunity from civil liability for their legislative activities," *id.* at 46, and the issue in the case concerned the availability of immunity for a city official. Reaching back to

the "taproots" of the privilege in 16th- and 17th-century England, the Court found that the actions of the local officials were legislative in nature and thus were entitled to absolute legislative immunity. We may therefore draw on the Supreme Court's guidance in this area without worrying about the level of government at which the legislator was operating.

Years before *Bogan*, in the case of *Gravel v. United States*, 408 U.S. 606 (1972) (otherwise famous because it dealt with the Pentagon Papers), the Supreme Court had to decide whether some assistants to Alaska Senator Mike Gravel were entitled to invoke legislative immunity to avoid testifying in response to grand-jury subpoenas. The Court first confirmed that for purposes of the privilege, the Senator and his aides were to be "treated as one." *Id.* at 616 (quoting *United States v. Doe*, 455 F.2d 753, 761 (1st Cir. 1972)). It then held that the Senator's alleged arrangement with a private press was not protected by the Speech or Debate Clause. *Id.* at 622. What is of greatest interest to us, however, is the Court's discussion of what the Clause *does* cover: "anything 'generally done in a session of the House by one of its members in relation to the business before it,'" *id.* at 624 (quoting *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880)), and "conduct at legislative committee hearings." *Id.* It then summarized the principle more broadly:

> The heart of the Clause is speech or debate in either House. Insofar as the Clause is construed to reach other matters, they must be an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of

> proposed legislation or with respect to other
> matters which the Constitution places within
> the jurisdiction of either House.

*Id.* at 625.

The question here is whether Minority Leader Brady's decisions about who is included within the Minority or Republican Caucus, and how to allocate resources to those people, are protected by the privilege. We conclude that they are. Simply to list the resources is to show how intimately they are tied to the legislative process. Recalling from *Gravel* that aides are protected by the privilege, we conclude that the minority staff analyses of bills are a valuable input into the legislative process. As Minority Leader, Senator Brady was attempting to use his party's resources as effectively as possible in furthering the party's legislative agenda. Setting legislative priorities for the minority party, including when to schedule bills, how to ensure that senators are ready to vote on them, is also quintessentially legislative activity. Drafting assistance is likewise legislative.

The organization of district events, coverage of local activities, and assistance with communications about legislative achievements is somewhat more removed from the ultimate act of legislating, but we are not being asked to evaluate Brady's immunity for any such constituent contacts. See *United States v. Brewster*, 408 U.S. 501, 512 (1972) (preparation of news letters to constituents, news releases, and speeches delivered outside the Congress are not protected legislative activities). Instead, the focus is on Brady's decisions about how *to allocate* the staff resources available to Illinois's Republican senators. Those decisions, we think, fit within the ambit of the "things generally done in a session of the [legislative

body] by one of its members in relation to the business before it." *Id.* at 532–33. Extra help in the form of staff resources is part of the leader's toolkit for managing his troops. We see no objective standard that we could use to second-guess the leadership's judgment about how and to whom those resources should be distributed. We note as well that the facts of our case are a far cry from those in *Brewster,* where the Court decided that legislative immunity does not protect a legislator who is under indictment for taking a bribe.

Modern state legislatures in the United States, including Illinois's General Assembly, rely heavily on the two-party system for their internal organization. The law of Illinois reflects this fact. The very statute that governs the allocation of staffing resources during the legislative session grants "the legislative leadership of the respective *parties*" the authority to assign staff assistants "to perform research and render other assistance to the members of that *party* on such committees as may be designated." 25 ILCS 160/2(a) (emphasis added). And as we noted earlier, Senate Rule 1-10 defines the term "majority caucus" to include "that group of Senators from the numerically strongest *political party* in the Senate," and Rule 1-16 defines the minority caucus as anyone not in the majority caucus. Political party, in other words, is an essential defining characteristic—and it is worth noting that the question whether someone is "really" a Republican, a Democrat, or something else, is not one of constitutional dimension. Allowing politics to play a role in politics does not violate the First Amendment. Moreover, the legislature is not required to operate as a free-for-all. Illinois law allows each caucus to select its leadership, and the leaders organize the legislative work. Thus, when Minority Leader Brady concluded that McCann's decision to split from the Republican Party meant

that he was no longer entitled to the minority party's resources for pushing legislation, he was acting in a legislative capacity.

This is obvious, to the extent that Brady decided that McCann could no longer participate in the Illinois Senate Republican Caucus—McCann had announced his intention to forswear the Republican party and to form his new Conservative Party. Brady's decision to evict McCann from the Minority Caucus is a little less plain, insofar as that caucus is defined to include anyone *not* in the Majority Caucus. But Brady and his fellow minority legislative leaders reasonably could conclude that the rules relating to the Majority and Minority Caucuses were created against the backdrop of a two-party system, and that they did not force the dominant minority party (the Republicans, in this case) to accept Green Party, Socialist Party, or Humane Party representatives into the Minority Caucus. Anyone elected from a third party is still entitled to the basic staff assistance and public resources of the General Assembly. Nonetheless, legislative leadership could surely block such a person from the internal deliberations of the dominant minority party—including, as in this case, its own staff's analyses of legislative proposals and its guidance as to how best to advance them—without straying outside the boundaries of absolute legislative immunity.

Imagining what would happen if we were to adopt McCann's position demonstrates why legislative immunity must apply here. McCann would have the federal courts micro-manage exactly which resources, and in what amount, the legislative leaders of the two major political parties dole out to their members. This is emphatically not our job. The Speech or Debate Clause, and the doctrine of legislative immunity on

which it rests, essentially tells the courts to stay out of the internal workings of the legislative process. The separation of powers principle reflected in Article II, section 1 of the Illinois Constitution, and inherent in the federal Constitution, requires us to accept the final output of the legislature without sitting in judgment about how it was produced. See *Fletcher v. Peck*, 10 U.S. 87, 131 (1810).

Finally, we comment on several additional arguments McCann has presented. First, we do not regard this as a case in which the decisions of the minority leader have constructively evicted McCann from the state Senate. As Brady points out, McCann has been entitled at all times to his personal staff, modest though those resources are, as well as the drafting assistance made available to all senators by the Legislative Reference Bureau. He also has full access to the public schedules of the General Assembly. Wherever the line for constructive eviction may lie, it has not been crossed here. Second, as we indicated earlier, the actions Brady took with respect to the resources of the minority party were not administrative in nature, as that term is used in Speech or Debate cases, nor were they *ultra vires*. *Bogan* gave as an example of an administrative action "the hiring or firing of a particular employee." 523 U.S. at 56. That is not the type of thing under attack in McCann and Mcdaniels's suit.

Last, we note that our decision adopts the same approach that the Third Circuit took in *Youngblood v. DeWeese*, 352 F.3d 836 (3d Cir. 2003), where that court decided that "two state representatives enjoy[ed] legislative immunity from another representative's claim that they unfairly allocated the legislature's office-staffing appropriation in violation of her civil rights." *Id.* at 837. The defendant representatives' allocations

of district office funds from the legislative appropriation was, the court concluded, a legislative act and hence entitled to immunity. Those allocations, the court said, were not the type of "extracurricular" activities mentioned in *Brewster*. Rather, it said, "the allocation activities fit the description the *Bogan* Court used to describe a substantively legislative act: 'a discretionary, policymaking decision implicating the budgetary priorities of the [House].' *Bogan*, 523 U.S. at 55–56." 352 F.3d at 842. We agree with that analysis.

### III

We have focused in this opinion on McCann's arguments, because he is the person most directly affected by Brady's decisions. We add here that we find nothing in Mcdaniels's position that would require a different result. Indeed, it is not even clear whether he has been affected directly enough to complain about the internal workings of the Minority and Republican Caucuses. McCann has continued to be his State Senator, and we have rejected the argument that McCann's lack of access to the Party Resources of the caucuses amounts to McCann's constructive eviction. Even if Mcdaniel can show some form of concrete injury from the challenged acts, he would run into the barrier of legislative immunity for Minority Leader Brady's decisions.

We therefore AFFIRM the judgment of the district court dismissing this action with prejudice.