RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 22a0099p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

───────────────

BERNADINE KENNEDY KENT, former State
Representative,

*Plaintiff-Appellant*,

*v.*

OHIO HOUSE OF REPRESENTATIVES DEMOCRATIC
CAUCUS; EMILIA SYKES, Minority Leader; FRED
STRAHORN, State Representative,

*Defendants-Appellees*.

No. 21-3884

───────────────

Appeal from the United States District Court for the Southern District of Ohio at Columbus.
No. 2:20-cv-06419—Edmund A. Sargus, Jr., District Judge.

Decided and Filed:  May 9, 2022

Before:  SUTTON, Chief Judge; MOORE and GILMAN, Circuit Judges.

───────────────

## COUNSEL

**ON BRIEF:**  Nicholas R. Owens, THE LAW OFFICE OF NICHOLAS R. OWENS,
Georgetown, Ohio, for Appellant.  Andrew D. McCartney, Julie M. Pfeiffer, OFFICE OF THE
OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellees.

SUTTON, C.J., delivered the opinion of the court in which GILMAN, J., joined.
MOORE, J. (pp. 13–16), delivered a separate opinion concurring in the judgment only.

───────────────

## OPINION

───────────────

SUTTON, Chief Judge.  Absolute immunity protects lawmakers from lawsuits for their

legislative acts.  At issue is whether the Ohio House Democratic Caucus performed a legislative

act when it expelled a representative from its ranks and barred her from accessing party resources. We conclude that it did and affirm the district court's decision dismissing this lawsuit against Caucus members.

I.

In 2016, the voters of the 25th District of Ohio elected Bernadine Kent to represent them in the Ohio House of Representatives. A Democrat, Kent became a member of the House Democratic Caucus under its rules.

Kent took an interest in the policies and accountability of the Columbus Police Department. In March 2018, she distributed a press release that accused the Chief of Police of wrongdoing. A week later, her office prepared a second press release that accused the Police Department of failing to take child-abuse reports seriously. She attached a letter from the Ohio Legislative Black Caucus to the mayor to similar effect. Kent's legislative aide submitted the documents to the House Democratic Caucus for public distribution. At that point, Fred Strahorn, then the Minority Leader, and his Chief of Staff prohibited the communications team from posting the press release online. Strahorn blocked any publication of the release because the attached letter to the mayor included unauthorized signatures.

Kent objected to Strahorn's actions, first in an email then in a series of formal complaints. At the end of April 2018, Strahorn gave an interview to the *Columbus Dispatch*, in which he justified his decision to block the release by explaining that he would not "tolerate a member of the caucus using staff and tax-payer funded resources to fake, forge or fabricate any claim, request or document to further their own political interest or personal vendetta." R.1 at 6. In May, Kent earned the Democratic nomination to run for reelection.

In June 2018, Strahorn called for a vote on Kent's membership in the Caucus. The members voted to remove her. As a result, Kent lost access to Caucus resources, including policy aides, communications professionals, lawyers, and administrative staff. The Caucus also barred her from attending its meetings. Through it all, Kent retained her seat in the House, and voters reelected her that fall.

In January 2019, after the new session of the House convened, the Democrats selected Emilia Sykes as the Minority Leader.  Several months later, when Kent attempted to attend a Democratic Caucus meeting, staff members "obstructed" and "prohibited" her from entering.  *Id.* at 10.  After the altercation, Sykes reminded Kent that the Caucus voted to remove her in 2018 and, removing all doubt, reaffirmed its decision in the new session.

Kent did not run for reelection in 2020.  But that did not end the conflict.

In December 2020, Kent filed a § 1983 claim, alleging that she suffered retaliation for speech protected under the First and Fourteenth Amendments to the Federal Constitution.  She sued Strahorn and Sykes as well as the "House Democratic Caucus," meaning "all persons duly-elected or appointed as a Member of the Ohio House of Representatives under the affiliation of the Democratic party."  *Id.* at 2.  The district court dismissed her complaint on the ground that legislative immunity barred it.  This appeal followed.

II.

When the Colonies broke from Britain in 1776, America got a fresh start in some ways but not in others.  American  legislative immunity does not turn on a fresh start.  Its origins emerge from a multi-century struggle between the English Crown and Parliament.  *United States v. Johnson*, 383 U.S. 169, 177–78 (1966).  In England's earliest days, "all powers were royal," including the power to legislate, and it was only "over time, as a result of specific struggles," that Parliament assumed "various of those powers."  Michael W. McConnell, *The President Who Would Not Be King* 74 (2020).

The 1600s cemented Parliament's legislative supremacy.  A.F. Pollard, *The Evolution of Parliament* 130 (2d ed. 1926); Nathan S. Chapman & Michael W. McConnell, *Due Process as Separation of Powers*, 121 Yale L.J. 1672, 1684 (2012).  That century saw a series of clashes between those who viewed the King's powers as absolute and those who believed the King must yield to Parliament in certain matters.  Chapman & McConnell, *supra*, at 1686–88.  Efforts to constrain the Crown produced the Petition of Right, which imposed "institutional checks" designed to "wrest lawmaking . . . power from the King."  *Id.* at 1688.  The struggles culminated in the Glorious Revolution of 1688, which "confirmed" the sovereignty and supremacy of

Parliament, Jack N. Rakove, *The Origins of Judicial Review: A Plea for New Contexts*, 49 Stan. L. Rev. 1031, 1055–56 (1997), and gave rise to the English Bill of Rights in 1689, Alexander J. Cella, *The Doctrine of Legislative Privilege of Freedom of Speech and Debate*, 2 Suffolk Univ. L. Rev. 1, 4 (1968).

Legislative immunity tracks the arc of Parliament's evolution. The immunity, oddly enough, owes its existence to the original "conception of Parliament as a *judicial* body." Robert J. Reinstein & Harvey A. Silverglate, *Legislative Privilege and the Separation of Powers*, 86 Harv. L. Rev. 1113, 1122 (1973). Lower courts could not hear "actions challenging the propriety of deliberations in a higher court," and Parliament was the "highest court of the land." *Id.* Members therefore enjoyed protection for the speeches and debates that they gave in Parliament. *Id.* But these freedoms were still considered "an act of grace on the part of the King." Leon R. Yankwich, *The Immunity of Congressional Speech—Its Origin, Meaning and Scope*, 99 U. Pa. L. Rev. 960, 963 (1951).

As Parliament flexed its legislative muscles, it found this partial privilege inadequate. The Crown resisted Parliament's newfound legislative role, especially in areas like royal succession and religion. Cella, *supra*, at 5; Reinstein & Silverglate, *supra*, at 1134. It pushed back by prosecuting members for "seditious" or "licentious" speech. Reinstein & Silverglate, *supra*, at 1126. In 1629, John Eliot, a member of the House of Commons, was sentenced to imprisonment "during the king's pleasure" for criticizing the war with France. *Id.* at 1127–28. Other members were prosecuted for statements of their own, and each tried to invoke the legislative free-speech privilege in response. Thomas P. Taswell-Langmead, *English Constitutional History* 527 (London 1875). But the convictions stood. The House later declared that the convictions violated Parliament's immunity and issued a resolution claiming an absolute privilege of speech and debate. *Id.* at 298; Reinstein & Silverglate, *supra*, at 1128. After the Glorious Revolution "definitively established" Parliament's authority over legislative matters, the English Bill of Rights provided a home for the privilege, declaring that "the freedom of speech, and debates or proceedings in Parliament, ought not to be impeached or questioned in any court or place out of Parliament." Taswell-Langmead, *supra*, at 624, 630.

The United States adopted England's legislative privilege "as a matter of course." *Tenney v. Brandhove*, 341 U.S. 367, 372 (1951). Before independence, many colonial assemblies had already recognized it. Yankwich, *supra*, at 965; Steven F. Huefner, *The Neglected Value of the Legislative Privilege in State Legislatures*, 45 Wm. & Mary L. Rev. 221, 231 & n.22 (2004). After independence, the States followed course. A decade before the Convention in Philadelphia in 1787, the Maryland Declaration of Rights provided "[t]hat freedom of speech and debates, or proceedings in the Legislature, ought not to be impeached in any other court or judicature." Md. Const. Declaration of Rights of 1776, art. VIII. In 1780, Massachusetts adopted a longer version, specifying: "The freedom of deliberation, speech, and debate, in either house of the legislature, is so essential to the rights of the people, that it cannot be the foundation of any accusation or prosecution, action, or complaint, in any other court or place whatsoever." Mass. Const. of 1780, pt. I, art. XXI. New Hampshire copied most of Massachusetts' clause, but dropped the word "accusation." N.H. Const. of 1784, art. I, § XXX. New Jersey and South Carolina took a different path to immunity through state constitutional provisions that incorporated English common law. N.J. Const. of 1776, art. XXII; S.C. Const. of 1776, art. XXIX; Huefner, *supra*, at 231 n.25.

The federal charters did the same. Even though some of the Framers feared "legislative excess," they likewise "carefully protected" legislative immunity at the federal level. *Tenney*, 341 U.S. at 375. The Articles of Confederation lifted the protection from the English Bill of Rights nearly word for word. Articles of Confederation of 1781, art. V, para. 5. The Federal Constitution followed closely, providing that "for any Speech or Debate in either House, [the Senators and Representatives] shall not be questioned in any other Place." U.S. Const. art. I, § 6, cl. 1. Delegates at the Convention approved the Clause "without discussion and without opposition." *Johnson*, 383 U.S. at 177.

The pattern continued in the States after ratification of the U.S. Constitution. In the next few years, Pennsylvania, Delaware, and Georgia included immunity provisions in their own constitutions. Del. Const. of 1792, art. II, § 11; Pa. Const. of 1790, art. I, § 17; Ga. Const. of 1789, art. I, § 14. Connecticut and Rhode Island, which operated under royal charters immediately after independence, included protections for legislators' speech and debate in their

first post-Revolution constitutions.  Conn. Const. of 1818, art. III, § 10; R.I. Const. of 1842, art. IV, § 5.  New York and Virginia recognized the privilege in colonial times, Mary Patterson Clarke, *Parliamentary Privilege in the American Colonies* 64–66 (1943), and codified it by statute, *Tenney*, 341 U.S. at 374 n.3; *Edwards v. Vesilind*, 790 S.E.2d 469, 477 (Va. 2016).  Both States formally incorporated the privilege during nineteenth-century constitutional conventions.  Va. Const. of 1870, art. V, § 11; N.Y. Const. of 1846, art. III, § 12.  For the most part, each of these original States opted for the Massachusetts model, later largely duplicated in the federal language providing that "for any speech or debate in either house," legislators "shall not be questioned in any other place."  Rhode Island added a twist, replacing "speech or debate" with "speech in debate."  R.I. Const. of 1842, art. IV, § 5.  Georgia introduced a new formulation, specifying that legislators not "be liable to answer for" their speech rather than that they not "be questioned" for it.  Ga. Const. of 1789, art. I, § 14.

The first state-court cases dignify the immunity.  An influential case arose in Massachusetts in 1808.  In an opinion that the U.S. Supreme Court later described as "perhaps[] the most authoritative case in this country" on legislative immunity, *Kilbourn v. Thompson*, 103 U.S. 168, 204 (1880), Chief Justice Parsons of the Massachusetts Supreme Judicial Court construed the state constitutional provision "liberally," *Coffin v. Coffin*, 4 Mass. 1, 27 (1808).  For the legislative privilege to realize its "full design" of enabling representatives "to execute the functions of their office without fear of prosecutions," the state court extended it not only to acts like "delivering an opinion, uttering a speech, or haranguing in debate," but also "to the giving of a vote, to the making of a written report, and to every other act resulting from the nature, and in the execution, of the office."  *Id.*  Other state court cases at the outset embraced similar interpretations of the common-law privilege for state and local legislators.  *See, e.g.*, *Jones v. Loving*, 55 Miss. 109, 111 (1877); *Dunham v. Powers*, 42 Vt. 1, 8–9 (1869); *Baker v. State*, 27 Ind. 485, 488–89 (1867); *Comm'rs of Anne Arundel Cnty. v. Duckett*, 20 Md. 468, 476 (1864); *Wilson v. New York*, 1 Denio 595, 599–600 (N.Y. 1845) (described as a "leading case regarding legislative immunity" in *Bogan v. Scott-Harris*, 523 U.S. 44, 49–50, 50 n.4 (1998)); *O'Donaghue v. M'Govern*, 23 Wend. 26, 29 (N.Y. 1840).

In 1880, the U.S. Supreme Court's first legislative-immunity case followed these footsteps in construing the federal guarantee. *See Kilbourn*, 103 U.S. at 203–04. It declined to take a "narrow view" and "limit" the Clause "to words spoken in debate." *Id.* at 204. If "a report," "a resolution," and "a vote" are not covered, the Court reasoned, "of what value is the constitutional protection?" *Id.* at 201. "In short," it continued, the Clause's logic applies to all of the "things generally done in a session of the House by one of its members in relation to the business before it." *Id.* at 204.

After *Kilbourn*, still more States fell in line. By 1950, 41 of 48 States had expressly protected legislative immunity in their constitutions. *Tenney*, 341 U.S. at 375 & n.5. Twenty-six States adopted the Massachusetts language or the largely similar federal version. Others put their own twist on it. Twelve States protected "words spoken," "words uttered," or "words used" in debate. And Maine and Illinois followed Georgia in ensuring legislators would not be "liable" or "held to answer." Huefner, *supra*, at 236–37, 237 n.53. Despite these variations, courts in States across these linguistic camps followed *Kilbourn* and *Coffin*, echoing the refrain that the privilege sweeps as broadly as the scope of a representative's legislative duties. *See, e.g.*, *Van Riper v. Tumulty*, 56 A.2d 611, 614 (N.J. Sup. Ct. 1948); *Bigelow v. Brumley*, 37 N.E.2d 584, 589–90 (Ohio 1941); *Cole v. Richards*, 158 A. 466, 467 (N.J. 1932); *Houghton v. Humphries*, 147 P. 641, 642 (Wash. 1915); *Commonwealth v. Kenneday*, 82 S.W. 237, 238 (Ky. 1904); *McGaw v. Hamilton*, 184 Pa. 108, 115–16 (1898); *Lewis v. Denver City Waterworks Co.*, 34 P. 993, 994 (Colo. 1893); *State v. Elder*, 47 N.W. 710, 715–16 (Neb. 1891) (Maxwell, J., concurring); *Canfield v. Gresham*, 17 S.W. 390, 392–93 (Tex. 1891); *Dunham*, 42 Vt. at 8–9.

That brings us to *Tenney v. Brandhove*, decided in 1951. The defendants were members of the California Senate. *Tenney*, 341 U.S. at 369. Unlike the federal defendants in *Kilbourn*, the Federal Speech or Debate Clause did not apply to them. And because § 1983 provides a federal cause of action, they could not invoke any state-law version of the Clause. *See Martinez v. California*, 444 U.S. 277, 284 & n.8 (1980); *cf. Tenney*, 341 U.S. at 375 n.5. Yet the Court still held that the state legislators enjoyed immunity. Even though the text of the statute creates a cause of action against "[e]very person" acting under color of state law, the Court held that this "general language" was not clear enough to indicate that Congress meant to abandon "a tradition

so well grounded in history and reason" as legislative immunity.  *Tenney*, 341 U.S. at 369–76. Because the defendants "were acting in the sphere of legitimate legislative activity" when they convened a hearing and called Brandhove to testify, Brandhove could not sue them for that conduct.  *Id.* at 376–79.

Later cases added refinements.  The Supreme Court now "generally . . . equate[s]" the scope of state legislators' statutory immunity under § 1983 with federal legislators' constitutional immunity under the Speech or Debate Clause and uses the relevant case law interchangeably. *Sup. Ct. of Va. v. Consumers Union of U.S.*, 446 U.S. 719, 733 (1980).  Regional legislators, local legislators, even non-legislative officials who act in a legislative capacity, enjoy immunity in § 1983 actions.  *Id.* at 734; *Lake Country Ests. v. Tahoe Reg'l Plan. Agency*, 440 U.S. 391, 405 (1979); *Bogan*, 523 U.S. at 53–55.  These principles hold true for lawsuits for monetary damages as well as for prospective relief.  *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 502–03 (1975).

Broad though the ambit of protection for the "legislative sphere" has become, it does not cover everything lawmakers do.  *Gravel v. United States*, 408 U.S. 606, 624–25 (1972). *Tenney*'s "sphere of legitimate legislative activity" remains the touchstone.  Echoing *Kilbourn*, the Supreme Court continues to explain that the "legislative sphere" reaches things "generally done in a session of the [legislature] by one of its members in relation to the business before it." *Gravel*, 408 U.S. at 623–24 (quotation omitted); *see Kilbourn*, 103 U.S. at 202–04.  That includes those matters "integral" to legislators' "deliberative and communicative processes" for evaluating bills, voting, or performing other tasks within their "jurisdiction."  *Gravel*, 408 U.S. at 625.  The privilege immunizes lawmakers from lawsuits that would "indirectly impair" their freedom to engage in tasks that are "indispensable ingredient[s] of lawmaking."  *Eastland*, 421 U.S. at 505.  Federal courts have applied the immunity to tasks ranging from voting on bills, *Bogan*, 523 U.S. at 55, to holding committee hearings, *Doe v. McMillan*, 412 U.S. 306, 311–12 (1973), to issuing subpoenas, *Eastland*, 421 U.S. at 505, to making a budgetary decision to eliminate an alternative school, *Smith v. Jefferson Cnty. Bd. of Sch. Comm'rs*, 641 F.3d 197, 216–19 (6th Cir. 2011) (en banc).

The States, for what it is worth, have largely moved in the same direction. *See, e.g.*, *Mesnard v. Campagnolo in & for Cnty. of Maricopa*, 489 P.3d 1189, 1193–94 (Ariz. 2021); *Olson v. Lesch*, 943 N.W.2d 648, 653–55, 653 n.5 (Minn. 2020); *Edwards*, 790 S.E.2d at 522–23, 529 (Virginia); *State v. Babson*, 326 P.3d 559, 581–83 (Or. 2014); *Baker v. Fletcher*, 204 S.W.3d 589, 593–95 (Ky. 2006); *Whalen v. Hanley*, 63 P.3d 254, 258 (Alaska 2003); *Brock v. Thompson*, 948 P.2d 279, 287–88, 287 n.26 (Okla. 1997); *State v. Neufeld*, 926 P.2d 1325, 1332 (Kan. 1996); *Colo. Common Cause v. Bledsoe*, 810 P.2d 201, 208–09 (Colo. 1991); *People v. Ohrenstein*, 565 N.E.2d 493, 501 (N.Y. 1990); *Holmes v. Farmer*, 475 A.2d 976, 980–81 (R.I. 1984); *Sweeney v. Tucker*, 375 A.2d 698, 703 (Pa. 1977); *Keefe v. Roberts*, 355 A.2d 824, 826 (N.H. 1976) (per curiam).

This uniformity is not universal. The Hawaii Supreme Court has held that delegates to the State's constitutional convention "purposefully intended to broaden the scope of . . . legislative immunity" beyond the federal model. *Abercrombie v. McClung*, 525 P.2d 594, 600 (Haw. 1974). Florida's courts have recognized a legislative privilege, distinct from legislative immunity, that protects representatives from testifying, even though the Florida Constitution lacks a clause of its own. *League of Women Voters of Fla. v. Fla. House of Representatives*, 132 So. 3d 135, 143–46, 147 n.11 (Fla. 2013). And the Wisconsin Supreme Court has suggested that the State's Clause may apply differently, though without providing specifics. *See State v. Beno*, 341 N.W.2d 668, 675 (Wis. 1984). But any post-1951 defectors do not alter our course in this case. The meaning of legislative immunity under § 1983, a question of federal law, has not deviated from *Tenney* and its offspring.

Measured by these requirements and these applications of the privilege, it extends to today's dispute—over a vote to remove a legislative member from the Democratic Caucus. The Caucus is inextricably bound up in the legislative process. The Caucus Leader assigns representatives to committees, directs debate and strategy for the House Floor, and "generally guide[s] the Caucus in its legislative strategy." R.7-1 at 7. The Whip executes the nuts and bolts of that legislative strategy and does everything from determining Caucus policy priorities to maintaining a count of where representatives stand on key legislation to answering questions for representatives about House policy or procedure. The committee ranking members assume

similar roles in their respective committees. The Caucus can even choose to take legislative positions and require members to vote a particular way on an initiative.

Control of Caucus membership directly affects these functions. The members select the Leader and the Whip, and the Leader in turn designates committee ranking members. Before the Caucus takes a position that binds its members, at least eighty-five percent of a quorum of the Caucus must vote to do so. In these ways, the makeup of the Caucus is "integral" to Caucus members' "deliberative and communicative processes." *Gravel*, 408 U.S. at 625. It follows that excluding a representative is "part and parcel" of that process and enjoys protection as well. *Id.* at 626.

The same is true for allocating Caucus resources. Determining how to distribute limited resources is a key lever that Caucus leadership may use to direct legislative strategy. Judicial intervention in such decisions would necessarily frustrate the representatives' ability to structure the deliberative process as they see fit.

Kent's arguments confirm the point. She acknowledges, indeed claims, that one of her lost benefits was access to legislative resources. She alleges that the Caucus blocked her from accessing its legislative policy staff; barred her from its meetings, some of which presumably involved legislative strategy; and prohibited her from participating in "substantive discussions regarding proposed legislation and policy matters" with Caucus members. R.1 at 8. Each resource is tied to the legislative process and the Caucus's strategy for navigating it. Kent shows how instrumental the Caucus's services were to her own legislative tasks when she asserts that their withholding "vastly diminished her effectiveness" and hindered her ability to "perform her official duties and functions" "adequately." *Id.* at 14–15. Addressing her claims would require us to assess how the Caucus makes its strategic decisions about those resources and how much weight that autonomy deserves in the face of a member's free speech rights, a cost-benefit analysis that legislative immunity pushes outside our reach.

We have company in reaching this conclusion. Other courts of appeals have addressed caucus membership and party resource allocation and have held that legislative immunity extends to both. *McCann v. Brady*, 909 F.3d 193, 194 (7th Cir. 2018); *Youngblood v. DeWeese*,

352 F.3d 836, 842 (3d Cir. 2003); *cf. Gamrat v. McBroom*, 822 F. App'x 331, 333–34 (6th Cir. 2020) (holding that legislative immunity insulated the Michigan House's decision to expel one of its members); *Whitener v. McWatters*, 112 F.3d 740, 745 (4th Cir. 1997) (holding that a county board of supervisors was protected by legislative immunity when it voted to discipline one of its members).  We agree that it is "emphatically not [the] job" of federal courts to "micro-manage exactly which resources, and in what amount, the legislative leaders of the two major political parties dole out to their members."  *See McCann*, 909 F.3d at 198; *see Youngblood*, 352 F.3d at 842.

Kent offers two responses.

She argues that the Caucus removed her for trying to circulate a press release, not for a legislative act.  This argument trains its aim at the wrong target.  Our focus is not on whether Kent's conduct qualifies as legislative activity; it is whether the conduct of the representatives she has sued does.  Kent, to be sure, alleges that the Caucus blocked her from relying on its "communications" and "media professionals."  R.1 at 8.  And the Court has noted that legislative immunity does not cover preparing "news letters to constituents, news releases, and speeches delivered outside" the House chamber.  *United States v. Brewster*, 408 U.S. 501, 512 (1972).  But the act of publishing a newsletter is different from denying a representative access to professional staff who could assist in the task.  It is this last act, which the Minority Leader could use to influence legislative strategy and is interwoven with the legislative process, that gave rise to this lawsuit.  *McCann*, 909 F.3d at 197.

Kent also contends that her removal falls outside the sphere of immunity because the Caucus does not have "discretionary legal authority" to remove her.  Appellant's Br. 22.  It is true that the Court has observed that a "discretionary, policymaking decision" bears "hallmarks of traditional legislation."  *Bogan*, 523 U.S. at 55.  But it is far from clear that to fall within the legislative sphere, an action must resemble legislation.  *Id.*  Remember, the Supreme Court has applied legislative immunity to tasks like issuing a subpoena in a congressional investigation, *Eastland*, 421 U.S. at 504–06, and participating in a committee investigation, *Doe*, 412 U.S. at 312.  And in any event, "discretionary," as used in *Bogan* and the cases that rely on it, distinguishes a discretionary exercise of judgment like adopting an ordinance, even an illegal

one, from a ministerial duty like complying with a court order. 523 U.S. at 51. The Caucus's decision to oust Kent remained discretionary under that meaning, even if it allegedly violated state law. *See Smith*, 641 F.3d at 218 (observing that even if officials "did not have the power to abolish the alternative school under Tennessee law," they "may still enjoy legislative immunity as individuals in federal court for their legislative actions, sound or unsound"). This argument fails to take Kent's expulsion and its consequences outside the legislative sphere.

In reaching this conclusion, we do not pass judgment on the merits of Kent's claim that the representatives retaliated against her for speaking freely on a matter of public concern. Even if her allegations are true, our system relies on "[s]elf-discipline and the voters," not the federal courts, "for discouraging or correcting such abuses." *Tenney*, 341 U.S. at 378. Whatever the lawmakers' motives, principles of immunity fence us out of the legislative sphere.

We affirm.

---

**CONCURRING IN THE JUDGMENT**

---

KAREN NELSON MOORE, Circuit Judge, concurring in the judgment.  I concur in the judgment.  Absolute legislative immunity protects the Ohio House Democratic Caucus's decision to remove Bernadine Kent from its ranks.

## I.  THE DOCTRINE OF LEGISLATIVE IMMUNITY

Legislative immunity derives from the federal Constitution's Speech or Debate Clause, which states in relevant part that, "for any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place."  U.S. Const. Art. I, § 6, cl. 1.  The Supreme Court has long interpreted this Clause to grant legislators "absolute immunity from liability under § 1983 for their legislative activities."  *Bogan v. Scott-Harris*, 523 U.S. 44, 49 (1998) (citing, *inter alia*, *Kilbourn v. Thompson*, 103 U.S. 168, 202–04 (1880)).  The Court held in *Tenney v. Brandhove* that this absolute legislative immunity applies to state legislators.  341 U.S. 367, 376 (1951).

The Supreme Court has instructed courts to interpret this grant of absolute immunity "broadly to effectuate its purposes."  *United States v. Johnson*, 383 U.S. 169, 180 (1966).  As the Court has recognized, the Clause "is framed in the broadest terms," and so does not "prevent only prosecutions based upon the content of speech."  *Id.* at 182–83 (internal quotation omitted).  Rather, "[a]bsolute legislative immunity attaches to all actions taken 'in the sphere of legitimate legislative activity.'"  *Bogan*, 523 U.S. at 54 (quoting *Tenney*, 341 U.S. at 376).

The Court has lived up to that language.  Legislators have been held immune from suit for a host of actions, including deciding to include private information in a report submitted to a congressional committee, *Doe v. McMillan*, 412 U.S. 306, 312–13 (1973); revealing classified information while participating in legislative committees, *Gravel v. United States*, 408 U.S. 606, 609, 616 (1972); and performing various other activities that are "clearly a part of the legislative process" including making a speech on the House floor, subpoenaing records for committee hearings, and voting for resolutions, *United States v. Brewster*, 408 U.S. 501, 515–16 & n.10

(1972). Lower courts have not hesitated to apply these cases to state legislators. *See, e.g.*, *McCann v. Brady*, 909 F.3d 193, 196–97 (7th Cir. 2018); *Youngblood v. DeWeese*, 352 F.3d 836, 840 (3d Cir. 2003).

This absolute immunity does not extend, however, to every act that a legislator may take. The Speech or Debate Clause provides protection for only those acts which are "an integral part of the deliberative and communicative processes." *Gravel*, 408 U.S. at 625. The protection extends beyond covering the content of legislators' speeches and debates "only when necessary to prevent indirect impairment of such deliberations." *Id.* (quoting *United States v. Doe*, 455 F.2d 753, 760 (1st Cir. 1972)). Thus, the Supreme Court has placed various legislative "errands"—preparing constituent newsletters, making speeches outside of Congress, appointing individuals to government agencies, and the like—beyond the Clause's protection. *Brewster*, 408 U.S. at 512. By instructing courts to contain the privilege within "its intended scope, its literal language, and its history," the Supreme Court has sought to avoid transforming legislators into "super-citizens." *Id.* at 516.

## II. THE CAUCUS'S CONDUCT

I now evaluate the Caucus's conduct under our law. As discussed above, the Supreme Court has taken a broad view of what qualifies as part of the legislative process. The Caucus's use of staff and resources to advance its interests falls within that broad definition, and the Caucus is therefore absolutely immune from Kent's suit.

Ohio law recognizes the existence of party caucuses in the houses of its general assembly. Ohio Rev. Code Ann. § 101.15(A)(1). Ohio law also recognizes these caucuses' political nature, exempting them from the state's open-meetings requirement and allowing them to engage in political strategizing and goal-setting in private. *Id.* at § 101.15(F)(2). By explicitly referencing party caucuses and the role that they play in Ohio's political ecosystem, the Ohio Revised Code suggests that state caucuses are engaged in "the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel*, 408 U.S. at 625. This strongly implies that the

discretionary decisions made by party caucuses fall within the protection of the Speech or Debate Clause. *See McCann*, 909 F.3d at 197–98.

Evaluating the actions that the Caucus takes on a day-to-day basis confirms that the Caucus engages in the sort of deliberative and communicative legislative work that the Speech or Debate Clause protects. To advance the legislative and political interests of the Ohio Democratic Party, the Caucus marshals professional resources including legal counsel, communications staff, and policy aides. R. 1 (Compl. at ¶¶ 28–30) (Page ID #8). The Caucus determines how to distribute those institutional resources—including "office-staffing request[s]" and the "selection of committees"—through a series of discretionary decisions. *See* R. 7-1 (Rules of the Ohio House of Representatives Democratic Caucus at 4) (Page ID #50). The Caucus's rules explain that those decisions will be informed by factors such as "involvement in the Caucus[ and] active participation in Caucus activities." *Id.*

The Caucus takes these actions with the end goal of advancing the interests of the Ohio Democratic Party. How the Caucus chooses to distribute its resources to achieve this end goes to an "integral part of the deliberative and communicative processes" of legislating. *Gravel*, 408 U.S. at 625. So, too, do the Caucus's decisions to discipline those whom it perceives, rightly or wrongly, as acting to subvert its ends or impede its cohesion. Here, the Caucus decided to remove Kent pursuant to these legislative ends, so the decision falls within "the sphere of legitimate legislative activity." *Tenney*, 341 U.S. at 376.

Separation-of-powers principles strengthen this conclusion. "The Speech or Debate Clause, and the doctrine of legislative immunity on which it rests, essentially tells the courts to stay out of the internal workings of the legislative process." *McCann*, 909 F.3d at 198. This case demonstrates the wisdom of keeping political disputes out of the courthouse. Were our court to adjudicate this matter, we would have to resolve a dispute between two essentially political positions: Kent's desire to use the "bully pulpit of her office as State Representative" to "advoca[te for] children and crime victims," Appellant Br. at 17 (internal quotation omitted), and the Caucus's determination of "who to include in their party caucus and how to allocate caucus resources," Appellee Br. at 2.

To review Kent's suit against the Caucus, we would be forced to evaluate whether the Caucus's decision to expel Kent *reasonably* furthered the Caucus's goal of promoting the Democratic Party's interests. Or perhaps we would just ask whether Kent's expulsion *plausibly* advanced those ends. Maybe, on the other hand, a more-stringent standard would be needed: whether Kent's expulsion *clearly* facilitated those goals. Given the thorny political issues involved, even picking a standard is fraught. The court should not go down this path. To do so "would compromise the independence of the legislative branch, the very principle legislative immunity is intended to protect." *Youngblood*, 352 F.3d at 842.

Buttressing my conclusion, our sibling circuits have applied the legislative privilege in similar circumstances. The Fourth Circuit concluded that "a legislative body's discipline of one of its members is a core legislative act." *Whitener v. McWatters*, 112 F.3d 740, 741 (4th Cir. 1997). The Seventh Circuit insulated from judicial scrutiny the decision to remove a member of the Illinois Senate from the Illinois Senate Republican Caucus, framing the expulsion as a "decision[] about how *to allocate* the staff resources available to Illinois's Republican senators." *McCann*, 909 F.3d at 197. The Third Circuit held that the Pennsylvania House Democratic Caucus's decision to deny one member "an adequate budget allocation" also fell within legislative immunity. *Youngblood*, 352 F.3d at 838, 841. And this court categorized the expulsion of a state representative from the Michigan House of Representatives as "within the legislature's sole jurisdiction." *Gamrat v. McBroom*, 822 F. App'x 331, 334 (6th Cir. 2020). These only strengthen the conclusion that legislative immunity applies to the Caucus's decision.

The Caucus's decision falls within absolute legislative immunity's broad parameters. I concur in the judgment to affirm the district court.