The slip opinion is the first version of an opinion released by the Chief Clerk of the Supreme Court. Once an opinion is selected for publication by the Court, it is assigned a vendor-neutral citation by the Chief Clerk for compliance with Rule 23-112 NMRA, authenticated and formally published. The slip opinion may contain deviations from the formal authenticated opinion.

# IN THE SUPREME COURT OF THE STATE OF NEW MEXICO

Opinion Number:

Filing Date: May 5, 2025

**NO. S-1-SC-40573**

**MIMI STEWART,**

Petitioner,

v.

**THE HON. DANIEL E. RAMCZYK,**
**District Court Judge,**
**Second Judicial District Court,**

Respondent,

and

**JACOB CANDELARIA,**

Real Party in Interest.

**ORIGINAL PROCEEDING**

Park & Associates, LLC
Alfred A. Park
Taylor M. Lueras
Albuquerque, NM

for Petitioner

Jones, Snead, Wertheim & Clifford, P.A.
Jerry Todd Wertheim
Carol A. Clifford
Santa Fe, NM

for Respondent

Candelaria Law Firm
Jacob R. Candelaria
Pro se
Albuquerque, NM

for Real Party in Interest

**OPINION**

**THOMSON, Chief Justice.**

{1}     This opinion is this Court's first opportunity to interpret the scope and meaning of the New Mexico Constitution's Speech or Debate Clause. N.M. Const. art. IV, § 13 ("Members of the legislature shall . . . not be questioned in any other place for any speech or debate or for any vote cast in either house.") Senate President Pro Tempore Mimi Stewart asks this Court to grant a writ of superintending control to answer two questions as to whether this Clause immunizes her from the consequences of reassigning then-Senator Jacob Candelaria's office in the State Capitol and his seat on the Senate floor. They are: (1) whether the district court erred when it concluded that it had to examine her motives before deciding whether she was entitled to legislative immunity under the Clause and (2) whether she is entitled to legislative immunity.

{2}     The United States Supreme Court has held that the United States Constitution's Speech or Debate Clause provides immunity for those "engaged in the sphere of legitimate legislative activity." *Supreme Court of Va. v. Consumers Union of U.S., Inc.*, 446 U.S. 719, 732 (1980) (internal quotation marks and citation omitted); *see also* U.S. Const. art. I, § 6, cl. 1. It has also been recognized under federal law that state legislators enjoy common-law immunity from liability for their

legislative acts, which is conterminous with that accorded to federal legislators under the Speech or Debate Clause for civil actions. *See Consumers Union*, 446 U.S. at 733 (explaining that "we generally have equated the legislative immunity to which state legislators are entitled under [42 U.S.C.] § 1983 to that accorded Congressmen under the Constitution").

{3}     In this opinion, we reference federal cases for guidance but emphasize that we do not adopt federal law nor do these cases compel our result. *See Michigan v. Long*, 463 U.S. 1032, 1041 (1983) ("If a state court chooses merely to rely on federal precedents as it would on the precedents of all other jurisdictions, then it need only make clear by a plain statement in its judgment or opinion that the federal cases are being used only for the purpose of guidance, and do not themselves compel the result that the court has reached."). Instead, our opinion rests separately, adequately, and independently on the New Mexico Constitution's Speech or Debate Clause. *See id*. ("If the state court decision indicates clearly and expressly that it is alternatively based on bona fide separate, adequate, and independent grounds, we, of course, will not undertake to review the decision."); *see also* N.M. Const. art. IV, § 13. We hold that Stewart's motive is irrelevant and that she is entitled to legislative immunity as a matter of law under the New Mexico Constitution. When legislative immunity applies, recourse is found not in the courts, but at the ballot box. *See EEOC v. Wash.*

*Suburban Sanitary Comm'n*, 631 F.3d 174, 181 (4th Cir. 2011). Consequently, we grant the writ and remand this case to the district court with instructions to dismiss Candelaria's complaint against Stewart.

## I.  BACKGROUND

{4}  In the summer of 2021, allegations of unlawful workplace discrimination on the basis of race and sexual orientation were lodged against Rachel Gudgel, then-director of the New Mexico Legislative Education Study Committee (LESC). As a member of the LESC, Senate President Pro Tempore Mimi Stewart was one of ten legislators tasked with casting votes related to the LESC's responsibilities, including the hiring and oversight of the director.[1] NMSA 1978, §§ 2-10-1 to -3 (1971, as amended through 1982). Jacob Candelaria, then-senator, alleged that Stewart used her authority as a member of the Committee to protect Gudgel from being terminated. He specifically alleged that Stewart "either voted to continue employing Ms. Gudgel or against proposals to terminate her as a member of the Legislative Education Study Committee."

---

[1]Established by statute, the New Mexico Legislative Education Study Committee is a "permanent joint interim committee of the [L]egislature." NMSA 1978, § 2-10-1 (1979). It is composed of ten legislators, four from the Senate and six from the House. *Id.* The Committee is tasked with conducting "a continuing study of all education in New Mexico" and hiring a director, who serves at the Committee's pleasure. NMSA 1978, § 2-10-3 (1979); NMSA 1978, § 2-10-2 (1982).

{5}   Candelaria opposed Gudgel's continued employment as director, and as he describes, "began to openly and pointedly criticize Ms. Stewart for minimizing the allegations of unlawful discrimination . . . thus ossifying race and sexual orientation based discrimination within Legislative agencies." In the press and on social media, Candelaria asserted that "Ms. Stewart had herself engaged in an unlawful discriminatory practice by turning a blind eye toward clear evidence of discrimination by Ms. Gudgel, who is non-Hispanic white."

{6}   Candelaria alleged that Stewart, in her role as Senate President Pro Tempore and in response to this criticism, relocated his "office in the Roundhouse from the ground floor with a window to a less desirable location on the third floor without a window" and "mov[ed] his seat on the Senate Floor to a less desirable location in the front row."

{7}   In 2022, Candelaria filed a complaint against Stewart alleging unlawful retaliation in violation of the New Mexico Human Rights Act (NMHRA), NMSA 1978, §§ 28-1-1 to -15 (1969, as amended through 2024), seeking monetary damages. In response to the complaint, Stewart filed a motion for judgment on the pleadings. Stewart argued that her assignments of office space in the State Capitol and seats on the Senate floor are legislative acts for which she is entitled to immunity under the Speech or Debate Clauses of the New Mexico Constitution and the United

4

Stated Constitution. *See* N.M. Const. art. IV, § 13; U.S. Const. art. I, § 6, cl. 1. Candelaria maintained that as a legislator, "[w]here your office is, is incredibly important. And it is a highly prized and sought-after accommodation . . . . It matters." Candelaria explained that he learned of Stewart's decision through an email entitled "Administrative notice."

{8} The district court denied Stewart's motion, reasoning that in order to decide whether Stewart's acts are protected by legislative immunity, it must examine Stewart's motives for moving Candelaria's office and seat. The court granted Stewart leave to file an application for interlocutory appeal. *See* NMSA 1978, § 39-3-4 (1999); Rule 12-203 NMRA.

{9} Stewart instead filed a petition for a writ of superintending control and a request for a stay with this Court. *See* N.M. Const. art. VI, § 3 (giving this Court "superintending control over all inferior courts"); Rule 12-504 NMRA (describing the procedure for extraordinary writs); Rule 12-207 NMRA (authorizing the appellate review and stay of district court orders). We granted the request to stay the district court proceedings. We held oral argument on this matter on December 12, 2024, and ruled from the bench, granting the writ and holding that the district court erred and Stewart is entitled to legislative immunity under the New Mexico Constitution's Speech or Debate Clause, *see* N.M. Const. art. IV, § 13.

## II.    DISCUSSION

{10}    We grant Stewart's petition for a writ of superintending control under Article VI, Section 3 of the New Mexico Constitution and describe the foundational principles of legislative immunity under Article IV, Section 13 of the New Mexico Constitution. Applying a de novo standard of review, we explain that the district court violated a firmly established principle of legislative immunity in concluding that it needed to examine Stewart's motives for moving Candelaria's office in the State Capitol and his seat on the Senate floor before deciding whether her acts are legitimate legislative activities. *See N.M. Pub. Regul. Comm'n v. New Mexican, Inc.*, 2024-NMSC-025, ¶ 17, 562 P.3d 548 ("This Court reviews the district court's grant of a Rule 1-012(C) NMRA motion for judgment on the pleadings de novo.").

{11}    We conclude that Senate President Pro Tempore Stewart has the authority to both allocate resources and make decisions related to structuring the Senate's deliberative process, acts that are both legitimate legislative activities. Consequently, we hold that Stewart is immune in the present case, and we remand this case to the district court to dismiss Candelaria's complaint.

## A.    Our Exercise of Superintending Control

{12}    "Article VI, Section 3 of the New Mexico Constitution confers on this Court superintending control over all inferior courts and the power to issue writs necessary

6

or proper for the complete exercise of our jurisdiction and to hear and determine the same." *Grisham v. Van Soelen*, 2023-NMSC-027, ¶ 9, 539 P.3d 272 (internal quotation marks and citation omitted). The power of superintending control "enables the Court to control the course of litigation in inferior courts and to correct any *specie* of error." *Grisham v. Romero*, 2021-NMSC-009, ¶ 15, 483 P.3d 545 (internal quotation marks and citation omitted). The Court employs this power "in exceptional circumstances: where the remedy by appeal seems wholly inadequate or where otherwise necessary to prevent irreparable mischief, great, extraordinary, or exceptional hardship, or costly delays and unusual burdens of expense." *Id.* (bracket, ellipsis, internal quotation marks, and citation omitted).

{13}     We exercise our superintending control power in this case because remedy by appeal would be wholly inadequate.[2] It is a firmly established principle that a court may not inquire into the motive or intent behind an act to determine if legislative immunity applies. *See Bogan v. Scott-Harris*, 523 U.S. 44, 54-55 (1998). If we allowed the district court case to proceed, Stewart would be forced to respond to discovery about her motive, precisely the burden the immunity is meant to prevent, before the grant of a final, appealable order. *See Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967) (per curiam) (explaining that the United States Speech or Debate

---

[2]District Judge Ramczyk and Candelaria argue that direct or interlocutory appeal, or a writ of error, would have been more appropriate in this case. First, while a writ of superintending control may not be used as a *substitute* for direct or interlocutory appeal, this Court may, of course, grant the writ when the case before it justifies our doing so. *State ex rel. Schiff v. Murdoch*, 1986-NMSC-040, ¶ 4, 104 N.M. 344, 721 P.2d 770. Second, while we have written that "we do not deem an exercise of our power of superintending control to be *as appropriate* a means for implementation of the collateral order doctrine as issuance of a writ of error," *Carrillo v. Rostro*, 1992-NMSC-054, ¶ 31, 114 N.M. 607, 845 P.2d 130 (emphasis added), we have never *precluded* issuance of a writ of superintending control to implement the doctrine.

Importantly, we question whether the collateral order doctrine is even applicable here, as Judge Ramczyk did not "conclusively determine the disputed question": whether Stewart was entitled to legislative immunity. *Id.* ¶ 16 (internal quotation marks and citation omitted). Instead, he found that the court had to examine Stewart's motives behind her acts before determining whether she was entitled to the immunity. While Judge Ramczyk's decision effectively stripped Stewart of the protections of legislative immunity, as explained later in this opinion, we do not reach a conclusion here regarding whether this decision alone was sufficient to invoke the collateral order doctrine as grounds for a writ of error.

Clause protects federal legislators "not only from the consequences of litigation's results but also from the burden of defending themselves"). Answering this question now, "at the earliest moment," will ensure that Stewart is not subject to further interference by the judicial branch, which raises significant separation of powers issues. *See Romero*, 2021-NMSC-009, ¶ 15 ("We may also exercise the power of superintending control where it is deemed to be in the public interest to settle the question involved at the earliest moment." (internal quotation marks and citation omitted)); *United States v. Johnson*, 383 U.S. 169, 178 (1966) ("In the American governmental structure the clause serves the additional function of reinforcing the separation of powers so deliberately established by the Founders."). Further, we write to provide a clear answer under New Mexico law to this constitutional question of first impression. *See Van Soelen*, 2023-NMSC-027, ¶ 10 (granting the writ of superintending control to consider a partisan gerrymandering claim, a matter of first impression "without clear answers under New Mexico law," that implicated both the "constitutional right to vote and the Legislature's constitutional responsibility for redistricting" (internal quotation marks and citation omitted)); *State ex rel. Torrez v. Whitaker*, 2018-NMSC-005, ¶¶ 31-32, 410 P.3d 201 (granting the writ of superintending control to consider "the new detention authority created by [a recent] constitutional amendment" because it was "an issue of first impression without clear

9

answers under New Mexico law" (ellipsis, internal quotation marks, and citation omitted)). We write to offer guidance to lower courts on how to properly apply the law of legislative immunity under the New Mexico Constitution's Speech or Debate Clause. *See Van Soelen*, 2023-NMSC-027, ¶ 9 (explaining that when this Court grants a writ of superintending control, it "may offer guidance to lower courts on how to properly apply the law") (internal quotation marks and citation omitted)).

**B.     Legislative Immunity**

{14}     Under the New Mexico Constitution's Speech or Debate Clause, "[m]embers of the legislature shall . . . not be questioned in any other place for any speech or debate or for any vote cast in either house." N.M. Const. art. IV, § 13. Stewart claims legislative immunity under both the New Mexico and the United States Constitutions' Speech or Debate Clauses, arguing that the federal Clause "has been held to extend to local legislators as well as federal legislators." However, that is unambiguously incorrect. "The Clause is, by its terms, limited to members of Congress." *Nat'l Ass'n of Soc. Workers v. Harwood*, 69 F.3d 622, 629 (1st Cir. 1995); *see also Lake Country Ests., Inc. v. Tahoe Reg'l Plan. Agency*, 440 U.S. 391, 404 (1979) ("The Speech or Debate Clause of the United States Constitution is no more applicable to the members of state legislatures than to the members of [Tahoe Regional Planning Agency]."). Instead, under federal law, "state legislators enjoy

10

*common-law* immunity from liability for their legislative acts." *Consumers Union*, 446 U.S. at 732 (emphasis added); *see also Lake Country Ests.*, 440 U.S. at 404. In short, the immunity Stewart claims under the United States Constitution does not exist. Thus, we will only consider her claim under the New Mexico Constitution.

{15} Our appellate courts have never before had the opportunity to interpret our Constitution's Speech or Debate Clause. Since the language of our Clause and the United States Constitution's Speech or Debate Clause are "substantially similar," we may look to federal caselaw for guidance. *Compare* N.M. Const. art. IV, § 13 ("Members of the legislature shall . . . not be questioned in any other place for any speech or debate or for any vote cast in either house."), *with* U.S. Const. art. I, § 6, cl. 1 ("[F]or any Speech or Debate in either House, [Senators and Representatives] shall not be questioned in any other Place."). *Gandydancer, LLC v. Rock House GCM, LLC*, 2019-NMSC-021, ¶ 38, 453 P.3d 434 ("We agree that it is appropriate to look for guidance in analogous law in other states or the federal system if New Mexico case law does not answer the question presented. However, interpretations of the laws of other jurisdictions provide guidance only if the analogous law is substantially similar . . . ." (internal quotation marks and citation omitted)). Further, because the federal common law immunity for state legislators is "similar in origin and rationale to that accorded Congressmen under the Speech or Debate Clause," we

11

also look to caselaw interpreting that immunity for guidance. *Consumers Union*, 446 U.S. at 732; *see also Lake Country Ests.*, 440 U.S. at 405. In drawing on federal law, however, we are not adopting the federal courts' interpretations nor any particular approach to parsing the nuances of a legislator's immunity from suit. *See, e.g.*, Steven F. Huefner, *The Neglected Value of the Legislative Privilege in State Legislatures*, 45 Wm. & Mary L. Rev. 221, 265-70 (2003) (discussing different state's interpretations of the scope of protected legislative activity); *Cruz-Guzman v. State*, 916 N.W.2d 1, 13 (Minn. 2018) ("As appellants suggest, the House and Senate are essentially arguing that the Minnesota Constitution provides them with absolute immunity for violating a duty that the constitution specifically imposes on the Legislature. We decline to interpret one provision in the constitution—the Speech or Debate Clause—to immunize the Legislature from meeting its obligation under more specific constitutional provisions—the Education, Equal Protection, and Due Process Clauses.") Instead, we rely on principles of legislative immunity as articulated through federal caselaw to resolve the case before us, which does not require delving into the more complex and controversial areas of the immunity. *Compare Chappell v. Robbins*, 73 F.3d 918, 921-22 (9th Cir. 1996) (explaining that "legislative immunity bars any RICO claim . . . based on . . . acceptance of bribes" because the proximate cause of the plaintiff's injuries was "writing a bill, voting for

it, and persuading others to vote for it"—legitimate legislative activities), *with United States v. Brewster*, 408 U.S. 501, 525-26 (1972) (explaining that legislative immunity does not bar a bribery claim under 18 U.S.C. § 201(c) because the plaintiff did not need to show that the bribe impacted speech, debate, or voting, since "acceptance of the bribe is the violation of the statute, not performance of the illegal promise").

{16}    The purpose of the immunity is to ensure "that the legislative function may be performed independently without fear of outside interference." *Consumers Union*, 446 U.S. at 731. "The reason for the [immunity] is clear":

> "In order to enable and encourage a representative of the public to discharge his public trust with firmness and success, it is indispensably necessary, that he should enjoy the fullest liberty of speech, and that he should be protected from the resentment of every one, however powerful, to whom the exercise of that liberty may occasion offense."

*Tenney v. Brandhove*, 341 U.S. 367, 373 (1951) (quoting James Wilson, II *The Works of James Wilson* 38 (Andrews ed., 1896)). Thus, the immunity exists not for the benefit of legislators, "but to support the rights of the people." *Id.* at 373-74 (internal quotation marks and citation omitted). The immunity reinforces the separation of powers by "protecting against possible prosecution by an unfriendly executive and conviction by a hostile judiciary." *Johnson*, 383 U.S. at 179. This function speaks directly to the Clause's historical roots: its language mirrors the

English Bill of Rights of 1689, the culmination of a struggle for parliamentary supremacy over the monarchy. *Id.* at 178. The difference is that the legislative branch, unlike Parliament, is a coordinate but not supreme branch. *Brewster*, 408 U.S. at 508. Thus, the immunity must be enforced with respect to the balance of power between the three coequal branches of government. *Id.* And along with the Clause's historical roots pointing toward preservation of the separation of powers, the Clause has long been held to also provide immunity from private actions. *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 502 (1975). Private actions, just like those brought by the executive branch, divert legislators' attention from their work and bring judicial power to bear, imperiling legislative independence. *Id.* at 503. The immunity protects legislators "not only from the consequences of litigation's results but also from the burden of defending themselves" when they are "engaged in the sphere of legitimate legislative activity." *Consumers Union*, 446 U.S. at 732 (internal quotation marks and citations omitted).

{17} We answer first whether a legislator's motive or intent is relevant to determining whether an act is a legitimate legislative activity. Concluding that neither is relevant, we then explain why moving Candelaria's office in the State Capitol and his seat on the Senate floor are both legitimate legislative activities for which Stewart is entitled to immunity.

**C. The District Court Violated a Firmly Established Principle of Legislative Immunity in Concluding That It Had to Examine Stewart's Motives Before Deciding Whether Her Acts Are Legitimate Legislative Activities**

{18} It is a firmly established principle that "[w]hether an act is legislative turns on the nature of the act, rather than on the motive or intent of the official performing it." *Bogan*, 523 U.S. at 54; *see also Sable v. Myers*, 563 F.3d 1120, 1124 (10th Cir. 2009).[3] The proposition that a court may not inquire into a legislator's motive or intent "has remained unquestioned." *Tenney*, 341 U.S. at 377; *see also Brewster*, 408 U.S. at 525 ("It is *beyond doubt* that the Speech or Debate Clause protects against inquiry into acts that occur in the regular course of the legislative process and into the motivation for those acts." (emphasis added)). This is because the immunity "would be of little value if [legislators] could be subjected to the cost and inconvenience and distractions of a trial upon a conclusion of the pleader, or to the hazard of a judgment against them based upon a jury's speculation as to motives."

---

[3]All federal circuit courts have ruled similarly. *See Torres-Rivera v. Calderon-Serra*, 412 F.3d 205, 213 (1st Cir. 2005); *NRP Holdings LLC v. City of Buffalo*, 916 F.3d 177, 191 (2d Cir. 2019); *Baraka v. McGreevey*, 481 F.3d 187, 201 (3d Cir. 2007); *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cnty.*, 684 F.3d 462, 470 (4th Cir. 2012); *La Union Del Pueblo Entero v. Abbott*, 68 F.4th 228, 238 (5th Cir. 2023); *Anders v. Cuevas*, 984 F.3d 1166, 1181 (6th Cir. 2021); *McCann v. Brady*, 909 F.3d 193, 196 (7th Cir. 2018); *Leapheart v. Williamson*, 705 F.3d 310, 313 (8th Cir. 2013); *Norse v. City of Santa Cruz*, 629 F.3d 966, 977 (9th Cir. 2010); *Weissman v. Nat'l Ass'n of Secs. Dealers, Inc.*, 500 F.3d 1293, 1297 (11th Cir. 2007); *Rangel v. Boehner*, 785 F.3d 19, 24 (D.C. Cir. 2015).

*Tenney*, 341 U.S. at 377. Simply put, "[t]he claim of an unworthy purpose does not destroy the privilege." *Id.* Thus, it is error for a court to inquire into a legislator's motive or intent "in resolving the logically prior question of whether their acts were legislative." *Bogan*, 523 U.S. at 54.

{19}    Both Stewart and Candelaria acknowledge this firmly established principle. Nevertheless the district court found, on its own and without citing authority, that it needed to examine Stewart's motive to decide whether her acts were legitimate legislative activities and ordered discovery to that effect. The district court erred in reasoning that judgment on the pleadings was not appropriate because the court first had to examine Stewart's motives before ruling on whether her acts are legitimate legislative activities. Thus, we proceed to consider that question "stripped of all considerations of intent and motive." *Id.* at 55.

**D.     Stewart's Acts Are Legitimate Legislative Activities, and She Is Entitled to Immunity**

{20}    Individuals are entitled to immunity when they are "engaged in the sphere of legitimate legislative activity." *Consumers Union*, 446 U.S. at 732 (internal quotation marks and citation omitted). "The heart of the Clause is speech or debate in either House." *Gravel v. United States*, 408 U.S. 606, 625 (1972). However, legitimate legislative activities include those "beyond just voting on legislation" or "discussion or speechmaking on the legislative floor." *Sable*, 563 F.3d at 1124;

16

*Reeder v. Madigan*, 780 F.3d 799, 802 (7th Cir. 2015). The immunity applies to "those things generally done in a session of the House by one of its members in relation to the business before it." *Brewster*, 408 U.S. at 512-13 (internal quotation marks and citation omitted).

{21}    Thus, the immunity also covers acts that are "an integral part of the deliberative and communicative processes by which Members participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *Gravel*, 408 U.S. at 625. The immunity extends "to matters beyond pure speech or debate . . . when necessary to prevent indirect impairment of . . . deliberations." *Id.* (internal quotation marks and citation omitted). In other words, *Gravel* provides two routes to legislative immunity for acts outside "the heart of the Clause": those integral to the deliberative and communicative process *of passing or rejecting legislation* and *other matters within the legislature's jurisdiction under the Constitution. Id.* Acts outside the sphere of legitimate legislative activity are commonly classified as political or administrative, though this case does not require us to explore the nuance of these categories. *See, e.g., Brewster*, 408 U.S. at 512 (example of a definition of a political

act); *Alexander v. Holden*, 66 F.3d 62, 65-67 (4th Cir. 1995) (example of a court distinguishing between legitimate legislative activities and administrative acts).

{22} Stewart argues, and we agree, that her reassignment of Candelaria's office in the State Capitol and his seat on the Senate floor are both legitimate legislative activities for which she is entitled to immunity.

{23} When Stewart, as Senate President Pro Tempore and a "presiding officer," is acting as President of the Senate, she is charged with "preserv[ing] order and decorum" and "decid[ing] all questions of procedure and order." *See* N.M. Const. art. IV, § 8; N.M. Senate Rules 4-1, 4-3 & 4-5 (55th Leg., 2021), https://www.nmlegis.gov/publications/Legislative_Procedure/senate_rules_21.pdf (last visited Apr. 29, 2025). She claims this gives her the authority to assign offices and seats on the Senate floor. Our reasoning and holdings that follow are limited to the facts of this case, specifically Stewart's unique role in the Senate and Candelaria's status as a then-senator.

**1. Stewart's reassignment of Candelaria's office in the State Capitol involves the allocation of resources, thus is a legitimate legislative activity**

{24} Courts have held that the allocation of party resources is integral to both the deliberative and communicative process of passing or rejecting legislation and other matters within the legislature's jurisdiction under the Constitution. *See Kent v. Ohio House of Representatives Democratic Caucus*, 33 F.4th 359, 366 (6th Cir. 2022)

18

(relying on the first rationale: the allocation of party resources is integral to the deliberative and communicative process of passing or rejecting legislation); *Youngblood v. DeWeese*, 352 F.3d 836, 841 (3rd Cir. 2003) (relying on the second rationale: the allocation of party resources is integral to other matters within the legislature's jurisdiction under the Constitution); *see also Gravel*, 408 U.S. at 625. Candelaria believes that these cases are distinguishable, pointing out that Stewart is tasked with allocating the resources of the *legislative branch* and the leaders in *Kent* and *Youngblood* were tasked with allocating the resources of a *political party*. *See* N.M. Senate Rules 4-1, 4-3 & 4-5 (55th Leg., 2021), https://www.nmlegis.gov/publications/Legislative_Procedure/senate_rules_21.pdf (last visited Apr. 29, 2025). We find this to be a distinction without a difference and believe that the facts of these cases are otherwise analogous and their rationale persuasive for the case before us.

{25} In *Kent*, the Minority Leader of the Ohio House of Representatives blocked the publication of a fellow representative's press release, which he claimed included "unauthorized signatures" and was a tool "to further [the representative's] own political interest or personal vendetta." 33 F.4th at 360-61. The Minority Leader called a successful vote to remove the representative from the Democratic caucus, causing her to lose access to caucus resources such as support staff and meetings

with other members. *Id.* at 361. The court reasoned that "[j]udicial intervention in such decisions would necessarily frustrate the representatives' ability to structure the deliberative process as they see fit." *Id.* at 366. In reasoning as such, the court seemed to rest its holding that allocating caucus resources was a legitimate legislative activity on the rationale that it is "'integral' to [the] 'deliberative and communicative processes'" of passing or rejecting legislation. *See id.* (quoting *Gravel*, 408 U.S. at 625).

{26}   Just as in *Kent*, where a disagreement with legislative leadership led to a legislator losing access to support staff and meetings with colleagues, Stewart argues that her decision to move Candelaria's office "impacts [his] access to staff and other Senators." Candelaria admits that his new office location was "less desirable." Before the district court, he admitted, "[w]here your office is, is incredibly important. And it is a highly prized and sought-after accommodation . . . . It matters." Just like the court in *Kent*, we think it imprudent to intervene in how legislators structure their internal deliberative and communicative processes.

{27}   In *Youngblood*, a Pennsylvania state representative alleged that "in retaliation for her dissent against the party leadership, they denied her an adequate budget allocation for district office staffing and constituent services." 352 F.3d at 838. The court held that this denial was a legitimate legislative activity because it was a

20

"'matter[] which the Constitution places within the jurisdiction of either House.'" *Id.* at 841 (quoting *Gravel*, 408 U.S. at 625). That "matter" was appropriating the very funds at issue, allocated by the legislature pursuant to Pennsylvania Constitution Article III, Section 11, which states, "'The general appropriation bill shall embrace nothing but appropriations for the executive, legislative and judicial departments of the Commonwealth, for the public debt and for public schools . . . .'" *Youngblood*, 352 F.3d at 841.

{28}    Again, a disagreement with legislative leadership led to a legislator losing access to support staff, similar to the case before us. Further, just as in *Youngblood*, it is also within our Legislature's jurisdiction under our Constitution to pass "[g]eneral appropriation bills [that] embrace nothing but appropriations for the expense of the executive, legislative and judiciary departments, interest, sinking fund, payments on the public debt, public schools and other expenses required by existing laws . . . ." N.M. Const. art. IV, § 16. Thus, to the extent that moving Candelaria's office involved the allocation of funds, Stewart's act is a legitimate legislative activity.

{29}    Finally, we agree with the court in *Youngblood* that scrutinizing the manner in which the Legislature allocates its resources "would compromise the independence of the legislative branch, the very principle legislative immunity is

21

intended to protect." 352 F.3d at 842; *see also McCann v. Brady*, 909 F.3d 193, 198 (7th Cir. 2018) ("The Speech or Debate Clause, and the doctrine of legislative immunity on which it rests, essentially tells the courts to stay out of the internal workings of the legislative process."). Therefore, we decline to do so and hold that Stewart's reassignment of Candelaria's office in the State Capitol is a legitimate legislative activity for which she is entitled to immunity.

**2.     Stewart's reassignment of Candelaria's seat on the Senate floor is a decision related to structuring the deliberative process, thus is a legitimate legislative activity**

{30}    Stewart argues that "reassigning a Senator's seat on the Senate floor is a decision related to structuring the deliberative process on that floor." Courts have held that the regulation of *lobbyists' admission* to a House or Senate floor is a legitimate legislative activity. In *Harwood*, a Rhode Island House of Representatives rule banned lobbyists from the floor while the House was in session. 69 F.3d at 632-33. The court reasoned that regulating lobbyist presence on the floor "necessarily affects the manner in which the House conducts its most characteristic legislative functions" and held that it was a legitimate legislative activity because it was "'an integral part of the deliberative and communicative processes by which Members participate in . . . House proceedings with respect to the consideration and passage or rejection of proposed legislation.'" *Id.* at 632 (quoting *Gravel*, 408 U.S. at 625).

Similarly, in *Reeder*, the Illinois state Senate denied a journalist media credentials because his employer was registered as a lobbyist, consequently denying him access to the floor. 780 F.3d at 803. The court reasoned the decision was "legislative in nature, and integrally so," and held that it was a legitimate legislative activity because it was "'necessary to prevent indirect impairment of . . . deliberations.'" *Id.* (quoting *Gravel*, 408 U.S. at 625 (using the second phrase to summarize the two routes to immunity for acts outside "the heart of the Clause")). Since the *Reeder* Court did not mention other matters within the legislature's jurisdiction under the Constitution, it seems that the court rested its holding on the rationale that the decision was integral to the deliberative and communicative process of passing or rejecting legislation. *See Gravel*, 408 U.S. at 625.

{31}   We find the reasoning of these cases persuasive and believe it logically follows that regulation of a *senator's seat* is even more integral to the deliberative and communicative process of passing or rejecting legislation than a *lobbyist's admission* to the floor. *See id.* Candelaria admitted that his new seat in the front row was "less desirable." Consequently, we hold that Stewart's reassignment of Candelaria's seat on the Senate Floor is a legitimate legislative activity for which she is entitled to immunity.

### 3. Candelaria's arguments that Stewart's acts are not legitimate legislative activities are unavailing

{32} Candelaria makes three arguments that Stewart's acts are not legitimate legislative activities and thus that she is not entitled to immunity: Stewart's activities do not satisfy the *Gravel* test, a textual difference between the United States and New Mexico Speech or Debate Clauses indicates that the New Mexico Clause is to be interpreted more narrowly, and Stewart admitted that her acts were administrative rather than legislative. We explain our disagreement with these arguments in turn.

{33} First, Candelaria argues that Stewart's acts "are . . . not an integral part of the deliberative and communicative process by which Legislators participate in committee and House proceedings with respect to the consideration and passage or rejection of proposed legislation or with respect to other matters which the Constitution places within the jurisdiction of either House." *See Gravel*, 408 U.S. at 625. He contends that because Senators could participate and vote in committee meetings and floor sessions remotely during the COVID-19 pandemic, office and seat locations are necessarily not "integral" to the legislative process. We acknowledge that the COVID-19 pandemic required the Senate to adapt its procedures in unprecedented ways. We decline to reach a decision on legislative immunity based on changes the Senate was forced to make in an unprecedented situation.

{34} Additionally, we note that this argument could be construed as at odds with Candelaria's complaint in this matter. He admitted before the district court, "[w]here your office is, is incredibly important. And it is a highly prized and sought-after accommodation . . . . It matters." His complaint similarly described his new office and seat as "less desirable." If we were to accept Candelaria's argument, we would be acknowledging that the basis of his NMHRA complaint is inconsequential to his core functions as a legislator. *Cf. Reeder*, 780 F.3d at 805-06 ("[I]t is an odd argument . . . since if accepted, it would suggest that access he wants is of little or no value.").

{35} Second, Candelaria argues that the New Mexico Speech or Debate Clause must be interpreted more narrowly than its counterpart in the United States Constitution. The United States Constitution Speech or Debate Clause provides, in relevant part:

> Senators and Representatives . . . shall in all Cases, except Treason, Felony and Breach of the Peace, be privileged from Arrest during their Attendance at the Session of their respective Houses, and in going to and returning from the same; and for any Speech or Debate in either House, they shall not be questioned in any other Place.

U.S. Const. art. I, § 6, cl. 1. The New Mexico Speech or Debate Clause provides:

> Members of the legislature shall, in all cases except treason, felony and breach of the peace, be privileged from arrest during their attendance at the sessions of their respective houses, and on going to and returning

25

> from the same. And they shall not be questioned in any other place for any speech or debate *or for any vote cast in either house.*

N.M. Const. art. IV, § 13 (emphasis added). Candelaria argues that the inclusion of the additional phrase "or for any vote cast in either house" in the New Mexico Speech or Debate Clause provides strong evidence that our framers intended to grant immunity "only for official acts taken by a member of the Legislature, during the proceedings of the Legislature, and regarding a matter before it—i.e. a matter requiring a vote."

{36} Candelaria's reading of this textual difference is flawed because he neglects to acknowledge that the additional language in New Mexico's Clause is disjunctive. Legislators cannot be questioned for "speech or debate *or* for any vote cast in either house." *Id.* (emphasis added). "[T]he word 'or' should be given its normal disjunctive meaning unless the context . . . demands otherwise." *Hale v. Basin Motor Co.*, 1990-NMSC-068, ¶ 9, 110 N.M. 314, 795 P.2d 1006. Thus, the language in New Mexico's Clause explicitly identifies an *additional* ground for immunity and in no way *limits* immunity to legislators during proceedings on matters requiring a vote.

{37} Third, Candelaria claims Stewart "admitted that her actions were administrative" by informing Candelaria in an email titled "Administrative notice" that his office and seat would be moved. Administrative acts not entitled to

26

legislative immunity may include personnel decisions, among others. *See, e.g., Alexander*, 66 F.3d at 66; *Leapheart v. Williamson*, 705 F.3d 310, 314 (8th Cir. 2013).

{38} However, Stewart's language does not suggest that she was admitting, as a legal matter, that her actions were administrative for the purpose of legislative immunity. *Cf. Baxter v. Gannaway*, 1991-NMCA-120, ¶ 21, 113 N.M. 45, 822 P.2d 1128 ("For the rule on judicial admissions to apply, the admission must be unequivocal and it must relate to facts and not personal opinion."). Moreover, it is the responsibility of the judiciary to interpret and apply the protections of the New Mexico Constitution. *See Van Soelen*, 2023-NMSC-027, ¶ 36. Parties cannot usurp the role of the courts by making "admissions" about how our Constitution should be interpreted.

**III.   CONCLUSION**

{39} The district court erred in concluding that it had to examine Stewart's motives behind her acts before deciding whether her reassignment of Candelaria's office in the State Capitol and his seat on the Senate floor are legitimate legislative activities. We conclude that both of Stewart's acts are legitimate legislative activities for which she is entitled to immunity. Consequently, we remand this case to the district court with instructions to dismiss Candelaria's complaint against Stewart.

{40}    **IT IS SO ORDERED.**


_____

**DAVID K. THOMSON, Chief Justice**

**WE CONCUR:**


_____

**MICHAEL E. VIGIL, Justice**


_____

**C. SHANNON BACON, Justice**


_____

**JULIE J. VARGAS, Justice**


_____

**BRIANA H. ZAMORA, Justice**